JOHN W. ROLLINS AND LINDA S. PRICKETT (FORMERLY LINDA S. ROLLINS), et al. [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Rollins v. Commissioner
Docket Nos. 7673-76, 1518-77, 8200-77, 11119-77, 11864-77, 13848-79, 13209-80, 13210-80, 13211-80, 13212-80, 22950-81, 23449-81, 7971-82
United States Tax Court
T.C. Memo 1993-643; 1993 Tax Ct. Memo LEXIS 659; 66 T.C.M. (CCH) 1869; December 30, 1993, Filed *659 For petitioners: Johannes R. Krahmer, Thomas Reed Hunt, Jr., Edmond D. Johnson, and John S. McDaniel. For respondent: Janet A. Engel and Joellyn R. Cattell. DAWSON
DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: These consolidated cases were assigned to Special Trial Judge Francis J. Cantrel pursuant to section 7443A(b)(4) and Rules 180, 181, and 183. [2] We agree with and adopt his opinion which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE CANTREL, Special Trial Judge: In the notices of deficiency, respondent determined deficiencies in and additions to Federal income taxes as follows: John W. Rollins and Linda S. Prickett (Formerly Linda S. Rollins)
Date of
Docket
Notice of
Taxable
Addition to Tax
Number
Deficiency
Year Income Tax
Sec. 6653(b) 7673-76
6/30/76
1967
$   410,229
$   205,114
1968
574,812
287,406
1969
1,137,991
568,995
1970
709,935
354,967
1971
1,040,174
520,087
1518-77
1/14/77
1972
2,479,159
1,239.580
11864-77
9/9/77
1973
386,597
193,298
13848-79
8/13/79
1974
246,777
123,388
13209-80
6/13/80
1975
1,341,829
-0-
*660 John W. Rollins
Date of
Docket
Notice of
Taxable
Addition to Tax
Number
Deficiency
Year Income Tax
Sec. 6653(b)
13211-80
6/13/80
1976
2,068,909
-0-
23449-81
7/30/81
1977
584,897.80
-0-
1978
359,423
-0-
Rollins Jamaica, Ltd.
Date of
Docket
Notice of
Addition to Tax
Number
Deficiency
FYE
Income Tax
Sec. 6653(b)
8200-77
4/28/77
9/30/72
291,542
-0-
11119-77
8/22/77
9/30/73
242,135
-0-
13212-80
6/13/80
9/30/76
1,204,130
-0-
9/30/77
1,333,142
-0-
7971-82
1/29/82
9/30/78
225,007
-0-
Jefferic Enterprises, Inc.
Date of
Docket
Notice of
Taxable
Addition to Tax
Number
Deficiency
Year Income Tax
Sec. 6653(b)
13210-80
6/13/80
1975
1,544
- 0 -
1976
2,112
- 0 -
22950-81
7/30/81
1977
96,047
- 0 -
Respondent, in the Amendment to Answer filed at docket No. 7673-76, raised sections 269 [3] and 482 and asserted an increased deficiency of $ 7,005 and an addition to tax under section 6653(b) of $ 3,503 for petitioners' 1970 taxable year. Respondent bears the burden of proof with respect to the new matter raised for the taxable years 1970 and 1971, and the increased deficiency *661 for 1970. Rule 142(a); Achiro v. Commissioner, 77 T.C. 881, 891 (1981). By Amendment to Answer filed at docket No. 8200-77, respondent asserted an increased deficiency for the fiscal year ended September 30, 1972, in the amount of $ 313, the burden of proof of which is upon respondent. Respondent, in the Amendment to Answer filed at docket No. 13209-80, refers to section 482 which was raised in the notice of deficiency. Consequently, the burden of proof remains on petitioner with respect to section 482. In the Second Amendment to Answer filed in that case, respondent asserted an increased deficiency for the taxable year 1975 in the amount of $ 306,445. Respondent concedes that she has the burden of proof on the increased deficiency. In the Amendment to Answer to Petition as Amended filed at docket No. 23449-81, respondent asserted an increased deficiency for the *662 taxable year 1977 in the amount of $ 128,926.20. The burden of proof on the increased deficiency is upon respondent. After concessions, the issues for decision are (1) whether gains on stock sales reported by petitioner's controlled corporations during 1970-73 [4] and 1975-78 are properly attributable to petitioner under the substance over form doctrine, or alternatively, to clearly reflect income or prevent evasion of tax under section 482; and (2) whether nondeductible amounts paid by petitioner for airplane expenses during 1967 and 1968 to a partnership in which he held a 50-percent interest are income to the partnership in those years. *663 In a memorandum of settlement filed with the Court prior to trial in these cases, the parties agreed that a 5 percent addition to tax under section 6653(a) applies to any deficiencies determined with respect to petitioner's taxable years 1967 through 1971. No other additions to tax shall apply to any of the taxable years 1967-78. FINDINGS OF FACT Many of the facts were stipulated and are so found. The stipulations of facts and attached exhibits are incorporated herein by this reference. At the time of filing the petitions herein, petitioners John W. Rollins and Linda S. Prickett (formerly Linda S. Rollins) resided at the addresses below: John W. Rollins Address
Docket No.
2917 Palm-Aire Drive North
7673-76, 1518-77,
Pompano Beach, Florida 33060
11864-77
Owl's Nest Road, Greenville,
13848-79, 13209-80,
Wilmington, Delaware 19807
13211-80, 23449-81
Linda S. Prickett Walnut Tree Road, R.D. #3
7673-76, 1518-77
Newark, Delaware 19711
11864-77
Campbell Road, Greenville,
13848-79
Wilmington, Delaware 19807
13209-80
At the time of filing the petitions in Rollins Jamaica, Ltd. and Jefferic Enterprises, Inc., both corporations' principal places of business were located *664 at One Rollins Plaza, Concord Pike, Wilmington, Delaware 19803. A. Introduction
1. Petitioner Petitioner John W. Rollins was lieutenant governor of the State of Delaware from 1953 to 1957. He ran for the office of governor in 1960. He is a man of modest beginnings and limited formal education, whose business acumen led him into a successful career of developing corporations. Petitioner began by working in and eventually managing various plants until the late 1940s when he acquired an automobile dealership and eventually started his own automobile leasing business. 2. RollinsLeasing Corp.
Petitioner incorporated the automobile leasing business as RollinsLeasing Corp. in Delaware in the early 1950s. It went public in 1968, becoming Rollins International for a period of time, and is now known as RLC Corp. (RLC). RLC is headquartered in Wilmington, Delaware, and engaged in the transportation services business, primarily automobile and truck leasing. A portion of the stock sales in issue involve petitioner's RLC stock, which is listed on the American Stock Exchange. Petitioner has held various offices in RLC: president, chairman, and chief executive officer. At *665 the time of the stock sales in issue, petitioner's basis in his RLC stock was virtually zero. 3. Rollins, Inc. In 1948, petitioner and his brother, O. Wayne Rollins, started Rollins Broadcasting, Inc., a communications business which grew out of the automobile leasing company's need for advertising. Rollins Broadcasting, Inc. acquired other businesses, went public in early 1960, and is now known as Rollins, Inc. (RI). RI is headquartered in Atlanta, Georgia, and is engaged in broadcasting as well as various service industries, at one time owning Orkin Exterminating. During the years at issue, petitioner held between 5-10 percent of RI's common stock and served on the board as a director. At various times he has served as its president, chairman, and chief executive officer. The majority of the stock sales in issue involve petitioner's RI stock, which is traded on the New York Stock Exchange. At the time of the stock sales, petitioner's basis in his RI stock was virtually zero. 4. Rollins Jamaica, Ltd.
Petitioner incorporated Rollins Jamaica, Ltd. (Jamaica), a Delaware corporation, in 1965, as a U.S. holding company for Rose Hall, Ltd., a Cayman Islands corporation. Rose *666 Hall, Ltd. in turn incorporated several subsidiaries to engage in developing property along the northern coast of the island of Jamaica, West Indies. Petitioner owned all of Jamaica's stock during the years in issue and served in various capacities in its management and on its board of directors. 5. Dover Downs, Inc.
Dover Downs, Inc. (Dover Downs) is a Delaware corporation that was organized prior to 1968 by business acquaintances of petitioner. Dover Downs constructed and operated a multipurpose race track facility for harness and thoroughbred horses, as well as for NASCAR automobiles in Dover, Delaware. Petitioner began investing in Dover Downs in 1968 before the race track facility was operational and quickly became a majority shareholder. Petitioner was never an officer of Dover Downs. 6. Jefferic Enterprises, Inc. Jefferic Enterprises, Inc. (Jefferic) is a Delaware corporation engaged in holding and developing land in Dover, Delaware. Jefferic began building a housing and apartment complex in 1968. Initially petitioner was one-third owner of Jefferic, becoming a 100 percent owner by 1971. 7. John W. Rollins & Associates
John W. Rollins & Associates (Associates) *667 is petitioner's Schedule C business through which he provides management and consulting services to Jamaica and Dover Downs. Associates engages in other business activities, including looking after petitioner's personal investments. Both RI and RLC were developed under the aegis of Associates. Before 1973, Jamaica's and Associates' offices were located on the basement and first floors of an apartment building known as the Devon in Wilmington, Delaware. After that time, Associates maintained separate offices from Jamaica on the 15th floor of the Rollins building in Wilmington, Delaware. Eugene W. Weaver (Mr. Weaver) is employed by and receives his salary from Associates. A certified public accountant and graduate of the University of Pennsylvania's Wharton School of Finance, Mr. Weaver worked for Price Waterhouse & Co. for 10 years. Thereafter, he came to work for petitioner in 1970 as his personal financial administrator, eventually becoming financial vice president of Jamaica, Dover Downs, and Jefferic. By 1973, Mr. Weaver was also a director of Jamaica, Dover Downs, Jefferic, Rose Hall, Ltd., and several of Jamaica's Jamaican subsidiaries. In connection with his duties *668 as an officer of Jamaica and Dover Downs, Mr. Weaver was responsible for procuring funds with which the corporations could carry out their various projects. Charlotte Hambleton (Mrs. Hambleton), came to work for petitioner as a bookkeeper in 1969, and remained with him until her retirement in 1981. She was on Associates' payroll until the end of 1973, at which time she was switched to the payroll of Rollins International (n.k.a. RLC). During the years in issue, she was directly supervised by Mr. Weaver. She maintained petitioner's personal accounts as well as those of Associates. As corporate secretary of Jamaica and Dover Downs, she kept minutes of their directors' meetings. In the 1950s and 1960s, Henry B. Tippie (Mr. Tippie) was a financial adviser to petitioner and his brother, O. Wayne Rollins, in both their personal and business affairs. With a degree in accounting from the University of Iowa, Mr. Tippie is a certified public accountant who owns and operates his own businesses as well as serving as RLC's chief executive officer and a director of RI. In 1974 he agreed to help work out the dire debt situation in which petitioner and his controlled corporations found themselves. *669 8. Rollins Brothers Partnership Petitioner and his brother, O. Wayne Rollins, each held a 50 percent interest in the profits and losses of the Rollins Brothers Partnership (the Partnership) during 1967 and 1968. In existence since 1946, the Partnership's principal business activities were breeding cattle and the leasing of a Lear jet. B. Stock Sales
1. Controlled Corporation Financing: a. Rollins Jamaica. -- i. Start Up Costs. Petitioner capitalized Jamaica with $ 1 million, receiving $ 250,000 equity and $ 750,000 debt. Jamaica acquired the stock of Rose Hall, Ltd., the parent of Rose Hall (Developments) Ltd., a Jamaican corporation which owned the historic Rose Hall plantation and 6,000 acres of undeveloped land near Montego Bay on the island of Jamaica. Petitioner was advised to set up Jamaica as a U.S. holding company in order to obtain financing from U.S. banks for developing the Rose Hall plantation. A comprehensive master plan originally encompassed restoration of the plantation's Great House, construction of four hotels, a championship golf course, and residential housing. Rose Hall, Ltd. incorporated several subsidiaries to engage in various phases of *670 the master plan and businesses ancillary to the Jamaican development projects. For example, Rose Hall (H.I.) was incorporated to own the Holiday Inn, construction of which began in 1967 and was completed in 1971 at a cost of approximately $ 9 to $ 10 million. Construction of the Holiday Inn was financed by a loan from the Bank of Nova Scotia (Nova Scotia). Rose Hall (Intercontinental) was incorporated to own the Intercontinental Hotel, construction of which began in 1971 and was completed in late 1974. Its construction was financed in part by a loan from Williams & Glyn's Bank Limited of London, England (Williams & Glyn's). Throughout the years in issue, petitioner continued to transfer RI and RLC stock to Jamaica. Petitioner owned all of Jamaica's stock at all relevant times. In 1971, petitioner was its president and chairman. Petitioner maintained an office in Jamaica's Holiday Inn in Montego Bay and was active in Jamaica's management. ii. Bank Borrowing. From 1966 through May of 1975, Jamaica borrowed large sums of money from nine banks: Nova Scotia, First Pennsylvania Bank (FPB), First National Bank of Memphis, National Bank of Washington (NBW), Williams & Glyn's, Continental *671 Bank & Trust (Continental), National Shawmut Bank of Boston, N.A. (Shawmut), Chase Manhattan Bank, and Girard Bank. Petitioner personally guaranteed and secured these loans with his stock in RI, RLC, and a company called Flowers Industries, Inc. Two of the banks, Nova Scotia and Williams & Glyn's, received RI stock owned by O. Wayne Rollins as additional collateral for Jamaica's loans. The parties summarized Jamaica's commercial loan activities from 1965 through 1978 in exhibits which, we will discuss at greater length infra. iii. Petitioner's Loans. From its incorporation and throughout the years in issue, petitioner advanced funds to and received loan repayments from Jamaica. During the period 1970-74, Jamaica and its subsidiaries needed money for operations and to make interest payments on outstanding loans. Petitioner would make short-term loans to his corporations when there were problems with selling stock that he had transferred, due to Securities and Exchange Commission (SEC) regulations, insider trading restrictions, or poor market conditions. Sometimes petitioner borrowed money from banks for the corporations, and loaned it to them until the corporations could *672 get another loan. Summaries of the activity between petitioner and Jamaica are contained in exhibits made part of this record. b. Dover Downs. -- i. Start Up Costs. Petitioner invested $ 1 million in Dover Downs' race track facility while it was still under construction in 1968. The $ 1 million debt was converted into equity the following year. Petitioner continued to contribute cash for stock such that shortly prior to the first stock transfer at issue in these cases, he owned approximately 80 percent of Dover Downs' common stock. ii. Bank Borrowing. During 1970-72, when the track was still not yet operational, Dover Downs was under financial pressure from trade creditors, particularly from its contractors. Dover Downs was borrowing from and making payments to several banks during this time, principally NBW and FPB, the latter holding a mortgage loan on Dover Downs' property. The proceeds from $ 2 million borrowed from NBW were used to pay for capital improvements to Dover Downs' facilities in Dover, Delaware. All of Dover Downs' loans were guaranteed by petitioner and secured by his RI and RLC stock. iii. Petitioner's Loans. When Dover Downs needed more money and *673 petitioner could not transfer stock because of SEC restrictions, petitioner loaned money to Dover Downs. Petitioner refers to these as "bridge loans" because they were short term in nature. Dover Downs repaid these loans with proceeds from subsequent sales of stock contributed by petitioner. c. Jefferic Enterprises. Between 1969 and 1972, Jefferic borrowed from the Industrial Valley Bank (IVB), using shares of petitioner's stock in RLC, RI, Standard Security Life Insurance Co., and Flowers Industries, Inc. as collateral. Jefferic borrowed $ 2.5 million from Continental-Illinois National Bank (CINB) in March 1973, on a demand basis. This loan was guaranteed by petitioner and secured by a first mortgage on Jefferic's real estate. Jefferic guaranteed a loan in the same amount to petitioner from CINB in April 1973. The CINB loans were cross-guaranteed by petitioner and Jefferic, and cross-collateralized by petitioner's RI and RLC stock. Petitioner also made loans to Jefferic from 1970-73. [5]
*674 2. Economic Downturn: a. U.S. Economy. The oil embargo of 1973 marked a significant change in the financial affairs of petitioner and his controlled corporations. Interest rates rose rapidly and the stock market dropped drastically. As a result, petitioner's and his corporations' debts became under-collateralized as the value of the stock securing the loans declined. The forecast for Jamaica and its subsidiaries dimmed as the poor financial climate adversely affected tourism worldwide. Fluctuating foreign exchange rates increased the amount of U.S. dollars required to repay Jamaica's Jamaican subsidiaries' loans. Moreover, there was no market for Jamaican vacation and resort real estate that Jamaica held for sale. In the United States, Jefferic also found itself developing realty that no one was buying as the domestic real estate market declined. Dover Downs' operations, too, were directly impacted by the soaring cost of gasoline. b. Financial Overruns. Although the Rose Hall Holiday Inn in Montego Bay was completed and operating, Jamaica was forced to spend upwards of $ 20 million to complete construction of the Intercontinental Hotel. Construction of the Intercontinental *675 Hotel was frustrated in 1971 when the United Fruit Co. reneged on its prior commitment to contribute 50 percent equity to the Rose Hall (Intercontinental) subsidiary, thus forcing Jamaica to make an unexpected additional equity investment in the project of several million dollars. Then sometime in the early 1970s when the Rose Hall Holiday Inn had 180 rooms filled, the Jamaican government cut off the public water supply to the hotel. Increased demands on the water supply caused by the hotels required construction of a private water system thus creating an unanticipated cost overrun of $ 800,000. Chase Manhattan Bank and the new Jamaican government eventually took possession of the central 3,000 acres of Jamaican real estate owned by Jamaica. Dover Downs was beset by financial difficulties from the time of petitioner's involvement through 1978. Dover Downs operated at a loss in the early years. A substantial cause of its troubles was its initially inadequate mortgage financing. Furthermore, because of its rural location, the closing of a direct access bridge in 1972, and the imposition of the oil embargo in 1973, Dover Downs was particularly vulnerable to competition from more *676 accessible race tracks in Pennsylvania and New Jersey. As a result, Dover Downs ceased its thoroughbred racing operations in 1973-74. During the period 1968-73, Dover Downs was under financial pressure from trade creditors, particularly race track facility construction contractors, who threatened to impose mechanic's liens. In addition to the inability to sell its real estate, Jefferic also encountered problems in the form of construction delays and cost overruns in the completion of the housing complex. Consequently Jefferic operated at a loss throughout its early years. c. Debt Servicing Problems. As the interest rates began to rise, both Jamaica and Dover Downs became delinquent in making interest payments on their bank debt. By 1974, the decline in the stock market caused the value of petitioner's RI and RLC stock pledged as collateral for his personal loans, as well as those of Jamaica, Dover Downs, and Jefferic, to fall to a fraction of their original values. The price of RI went from $ 53.50 per share in the early 1970s to $ 6.25, and RLC decreased from $ 45 per share to $ 2 3/8. As the value of the stock decreased, the banks demanded more collateral. By March 1974, *677 petitioner had pledged all of his personal RI and RLC stock and some of his brother O. Wayne Rollins' RI stock to secure the loans. Since Jamaica, Dover Downs and Jefferic had neither sufficient cash flows nor marketable assets with which to repay their loans, the loans neared default with respect to both principal and interest. By 1974, the corporations were unable to meet either their operating expenses or their debt service requirements. Bank loan officers from Shawmut, NBW, and Continental testified that petitioner and his controlled corporations had become "problem loan situations" in 1974, and that the banks were anxious to be repaid. The situation reached a crisis point when Williams & Glyn's threatened to sell the collateral stock held for Jamaica's loan. In March 1974, petitioner prevailed upon Mr. Tippie to return to Wilmington, Delaware, to assist petitioner in straightening out his financial affairs, as well as those of his controlled corporations in debt. d. The Debt Workout. Mr. Tippie agreed to return to Wilmington to plan and negotiate repayment of all the loans outstanding -- petitioner's personal loans and those of Jamaica, Dover Downs, and Jefferic. Mr. *678 Tippie's goal was to prevent any bank from selling either O. Wayne Rollins' or petitioner's collateral stock. Mr. Tippie's principal concern was that all of the banks would begin selling the collateral, which would further drive down the price of the RI and RLC stock and inhibit petitioner's ability to repay the loans. From 1974 through 1978, Mr. Tippie worked with all the lenders to reschedule the loan repayments of petitioner, Jamaica, Dover Downs, and Jefferic, and to obtain additional time to make payments. Mr. Tippie collected all the information regarding petitioner's and the corporations' outstanding debts, and prepared schedules summarizing the status of the loans. According to the master debt sheet prepared by Mr. Tippie, the combined debt of petitioner, Dover Downs, Jefferic, Jamaica and its subsidiaries had reached over $ 55 million. As of March 1974, petitioner personally owed $ 11,477,000, Dover Downs owed $ 7,081,000, Jamaica owed $ 10,570,000 (exclusive of subsidiaries' debts), and Jefferic owed a little over $ 5 million. Mr. Tippie was able to persuade the banks to refrain from taking any action with respect to the collateral stock until mid-1975. Mr. Tippie's *679 overall plan involved attempting to consolidate the various loans to one debtor whenever more than one debtor had borrowed from the same bank. The purpose of consolidation was to prevent a bank from calling all loans to petitioner and his corporations if only one of them was in default. With the exceptions of Williams & Glyn's and IVB, who were not amenable to Mr. Tippie's suggestions, most banks cooperated with Mr. Tippie in working out revised debt payment schedules. In May 1975, Williams & Glyn's made a written demand on Jamaica for payment of its loan, calling for petitioner's performance under his guarantee, and threatening to sell the collateral stock, some of which was owned by O. Wayne Rollins. Mr. Tippie had petitioner borrow money to pay off Jamaica's debt. Then Mr. Tippie and Mr. Weaver caused Jamaica to assume some of petitioner's personal debts to other banks. The details of these transactions will be discussed infra. The bulk of the corporations' assets were tied up in land they owned, which was not liquid at that time due to the market conditions. The only available sources for the repayment of the loans were real estate owned by the corporations and petitioner's *680 marketable securities, primarily his RI and RLC stock. By mid-1975, Mr. Tippie decided some of petitioner's stock held as collateral for the loans should be sold. His decisions regarding the timing of the sales were based on the stock's current price, the intensity of pressure from a particular lender, the potential for market improvement, SEC regulations, and insider trading restrictions. Mr. Tippie was aware of Jamaica's and Dover Downs' net operating losses and their expiration dates. Mr. Tippie was largely successful in his efforts because by September 1977, the consolidated debt statement shows a much improved situation. Petitioner's personal liability was down to $ 4,616,000; Jefferic's to $ 3,004,000; Jamaica's to $ 3,856,000; and Dover Downs' decreased slightly to $ 6,498,000. 3. Mechanics of Stock Transfers: Against this backdrop, from 1970 through 1978, petitioner transferred some 463,000 shares of RI, 106,667 shares of RLC, and 11,712 shares of Flowers Industries Inc., to Jamaica's brokerage accounts to which proceeds of more than $ 12.5 million were posted on the stock's subsequent sale. From 1970 through 1975, petitioner transferred 159,000 shares of RI stock *681 to Dover Downs' brokerage accounts to which proceeds of more than $ 4 million were posted. Petitioner characterizes these transfers of stock to Jamaica, Dover Downs, and Jefferic as capital contributions to fund the corporations' operations and debt servicing requirements. a. Telephone Call. For the period 1970 through 1973, petitioner purportedly contributed stock to Jamaica worth $ 3.6 million which Jamaica usually reported as sold on the same day that petitioner ordered the stock transferred from his account. Similarly, Dover Downs reported $ 2.9 million of capital gain from stock sales during this period. In those early years, petitioner "contributed" the stock to Jamaica and Dover Downs with the express intention that it be sold immediately to generate cash for the corporations. Mr. Weaver recommended that petitioner follow this course of action as the most cost effective way of funding the equity requirements of Jamaica and Dover Downs. Petitioner, Mr. Weaver, Mr. Tippie, Mrs. Hambleton, and the brokers knew how these transfers occurred. When told that one of the corporations needed money, petitioner's priority was to sell as little stock as possible. For the years *682 1970-73, petitioner and Mr. Weaver determined how many shares would be contributed based upon the amount of cash needed by the corporations, the market price for the stock, and the amount of shares that legally could be sold within the SEC rules. During all the years in issue (1970-78), petitioner's employees at Associates maintained records reflecting the opening, high, low, and closing prices of RI and RLC stock, as well as the change in price from the previous day and the number of shares traded on the market. Associates kept track of how many shares could be sold at any given time under SEC rules. The determinations necessary to figure out how much stock to sell were often made while on the phone with the broker. The phone call would culminate in petitioner's directing the broker to sell a certain amount of stock based on the amount of cash the corporations needed. Sometimes Mr. Weaver spoke to the broker, and sometimes Mrs. Hambleton made the call at petitioner's or Mr. Weaver's direction. For stock sales occurring prior to 1974, the stock was thus sold by the brokers upon receiving the telephone call from petitioner, Mr. Weaver, or Mrs. Hambleton, advising that petitioner *683 intended to sell some stock and requesting that it be transferred to the corporation account on whose behalf the stock was to be sold. The mechanics of the stock sales occurring after 1974 were quite different; it was Mr. Tippie who decided when to contribute petitioner's stock to Jamaica, Dover Downs and Jefferic. Pursuant to a plan developed by Mr. Tippie for selling contributed stock to retire the outstanding debts over time, the stock was transferred into the corporations' names and held for some period of time before it was sold. The parties agree that the purpose of petitioner's RI stock transfers to Jamaica, Dover Downs, and Jefferic during the period from 1975 through 1978, was to provide the corporations with a source of funds for repaying their bank loans. b. Follow-up Procedures. Certificates of petitioner's RI and RLC stock not pledged as collateral on a bank loan were kept in a bank safe deposit box, while stock powers signed by petitioner were kept in a safe in the Associates' offices. Mrs. Hambleton had unrestricted access to both. After the telephone call to the broker had been made, Mrs. Hambleton's procedure was to collect the stock certificates, and attach *684 to them blank stock powers signed by petitioner. Mrs. Hambleton prepared a transmittal letter from a form. She would then send the certificates and powers in separate envelopes to the brokers. Petitioner, Jamaica, Dover Downs, and Jefferic maintained stock brokerage accounts and transacted sales of stock through the following brokerage firms: Dominick & Dominick (Dominick) from December 1968 through December 1972; Laird, Bissell & Meeds (Laird) from January 1970 through January 1973; Robinson-Humphrey Co. (Robinson) from October 1971 through June 1978; and Cantor, Fitzgerald, Inc. in October 1975. In the earlier years, the stock powers were mailed to broker George Gregory (Mr. Gregory) at Dominick in Buffalo, New York, and hand-delivered to broker Caleb H. Smith (Mr. Smith) of Laird in Wilmington, Delaware. Upon Mr. Tippie's arrival in 1974, petitioner used the brokerage firm of Robinson in Atlanta, Georgia, more frequently. After Mrs. Hambleton forwarded stock certificates accompanied by blank signed stock powers to the brokers for corporate sale, the broker would assign the stock to the appropriate corporate accounts. Thus the certificates were never sent to the corporate *685 offices of Jamaica and Dover Downs for transfers and sales occurring before 1974. c. Timing of Sales. The record contains joint exhibits summarizing the sales of RI stock reported by Jamaica from January 1970 through December 1978. Stock sales reported by Dover Downs in 1970-73 and 1975 have also been summarized and entered as joint exhibits. The summaries list the settlement and trade dates, the date written correspondence was sent to the broker, the date shares were sent to and received by the broker, as well as the number and price per share, gross and net proceeds, and the amount of capital gain. For stock sales reported by Jamaica and Dover Downs from 1975-78, there are additional columns showing which broker settled the sale, the date shares were acquired by Jamaica from petitioner, and to which bank the proceeds were applied. The trade date is the day a stock sale transaction takes place on the floor of the stock exchange. On the trade date, the seller enters into a binding contract to sell the stock, and the buyer assumes all rights and responsibilities of ownership. The settlement date is when the selling customer must deliver securities sold to the buyer. Stock *686 certificates and stock powers were normally sent to the broker within a few days after the telephone call ordering the sale. For sales prior to 1974, the stock was usually sold on the floor of the exchange before the brokers actually received the stock certificates and powers. On those occasions when stock certificates and powers had not been received before the settlement date, the broker would use other certificates held by the firm to complete the transaction. Thus, prior to 1975 the stock was never sent to the corporate offices of Dover Downs or Jamaica directly, or registered in either corporation's name because it had already been or was being immediately sold. After 1974, the contributed stock was not sold immediately. Jamaica and Dover Downs held the shares contributed by petitioner for a period of time (several weeks to 2-1/2 years) before selling them. d. Title and Authorization. i. Early years. -- (a) Petitioner's Authority. Jamaica's brokerage account agreement with Laird authorized Jamaica's president, vice president, and treasurer (who were petitioner, William Campbell, Jr., and Mr. Weaver, respectively), to act on the corporate account with respect to purchasing, *687 investing in, acquiring, selling, possessing, transferring, exchanging, or disposing of shares of stock, or certificates of interest. Listed as Jamaica's corporate secretary, Mrs. Hambleton, bookkeeper for Associates from 1970 through 1973, was not specifically authorized to transact business on the account. Jamaica's account agreement with Laird also provided that the brokers may deal directly or indirectly with any and all of the empowered persons as though they were dealing with the corporation directly. Dover Downs also maintained an account with Laird with the same provisions for authorization. Petitioner, however, was not an authorized officer of Dover Downs. Dover Downs' broker agreement with Dominick, where petitioner and Jamaica also maintained accounts, authorized Mr. Weaver to act on the corporate account. As Dover Downs' vice president, Mr. Weaver was empowered to give orders on Dover Downs' behalf for the purchase, sale, or other disposition of stock, bonds, or securities, and to deliver and receive from Dominick or Laird, money, stock, and securities, and to make, execute, and deliver under corporate seal any and all written endorsements and documents necessary *688 or proper to effectuate the authority conferred. As a broker and vice president for Dominick during 1970 and 1971, Mr. Gregory typically spoke with petitioner on the telephone twice daily during those years with respect to petitioner's accounts at Dominick. Petitioner would orally instruct Mr. Gregory to transfer shares from petitioner's account to Jamaica's or Dover Downs' account, and such instructions were usually followed up in written form. At petitioner's direction, Mr. Gregory took orders from petitioner to sell such stock transferred to Dover Downs' account even though petitioner was not an authorized officer of Dover Downs. Mr. Gregory occasionally executed sales for Jamaica's and Dover Downs' accounts on Mrs. Hambleton's direction without any other authorization before the sale. Mr. Smith from Laird also spoke with petitioner daily during the years 1970-73. He, too, dealt with petitioner on behalf of Dover Downs in spite of the fact petitioner was not specifically authorized on Dover Downs' corporate account. Mr. Smith would execute a trade for the benefit of Jamaica or Dover Downs based upon a telephone call from petitioner, Mrs. Hambleton, or Mr. Weaver with the *689 understanding that the written confirmation would be mailed to him afterwards. Mr. Gregory received oral authorization from petitioner, Mr. Weaver, or Mrs. Hambleton to transfer shares from petitioner's account to Jamaica's and Dover Downs' accounts. However, written authorization for the transfer and sale of shares was not always received. Records reflect that written authorization was usually sent a few days after the trade date, but sometimes it was not sent at all. Authorization received for sales of stock reported by Jamaica was signed by petitioner, Mr. Weaver, or by Mrs. Hambleton signing on petitioner's behalf for the majority of it. For sales of stock reported by Dover Downs in 1970, written correspondence authorizing the transfers and sales was sent by both petitioner and Mr. Weaver. In 1971 and 1972, petitioner sent almost all of the correspondence for Dover Downs. Prior to 1975, the RI and Rollins International (n.k.a. RLC) stock sold on behalf of Jamaica and Dover Downs was still registered in petitioner's name at the time of sale. Maintaining that the registered name is irrelevant if the certificate has been properly endorsed by a person authorized to sell the *690 stock, both brokers preferred receiving blank stock powers signed by petitioner to legally transfer ownership of the shares. (b) Corporate Approval. The record contains minutes of Jamaica's board of directors' meetings accepting contributions of 23,000 shares of petitioner's RI stock and authorizing its sale during 1970. There are minutes acknowledging receipt and authorizing the sale of 34,500 shares of RI stock out of the 44,500 shares sold during 1971, and 4,000 shares out of 26,500 shares sold in 1972. Although these are joint exhibits, respondent does not stipulate that in every case the dates on which the actions are reflected as having occurred are actually the dates the actions took place. The record contains stipulated signed reports of executive committee meetings of Dover Downs' board of directors during the years in issue. These show the board's pattern of ratifying petitioner's transfers of stock made during the preceding year. On December 13, 1971, there was an "action in writing" ostensibly characterizing petitioner's transfers of RI and Rollins International (n.k.a. RLC) stock during 1970 and 1971 as nontaxable section 351 exchanges, and discussing Dover Downs' *691 ability to offset the gains from the stock sales against its net operating loss carryovers. Similarly on October 3, 1972, Dover Downs' board executed an action in writing with respect to petitioner's transfers of RI and Rollins International (n.k.a. RLC) stock made during 1972. In January 1971, Dover Downs' accounting firm, Price Waterhouse & Co., recommended that Dover Downs seek legal advice as to the issuance of no par stock to petitioner for the transfers of stock he made to Dover Downs during its 1971 fiscal year. In a letter dated August 16, 1971, to Associates' accountant Anthony Simone (Mr. Simone), Paul Boswell (Mr. Boswell), an attorney in a Dover, Delaware law firm, issued a legal opinion on this subject. The letter makes repeated reference to the lack of minutes from Dover Downs' board meetings which Mr. Boswell assumes "were held regularly and duly held approving such transfers." From a postscript, it appears that Mr. Boswell had been supplied with minutes of resolutions adopted at Dover Downs' board's special meetings. "These were the only references among the corporate minutes delivered to us with respect to the issuance of stock to John W. Rollins, Sr. These *692 resolutions make no reference to the fact that the transfers were 351 transfers and that Dover Downs, Inc. stock was being exchanged for stock." In response Mr. Simone, on August 31, 1971, sent a "Board of Directors resolution covering section 351 transfers" for Price Waterhouse & Co.'s approval. The draft resolution bears the date August 1, 1970. On September 7, 1971, Mr. Boswell wrote to Mr. Simone: After quickly reviewing [your letter], I would suggest that, if there were no previous Board of Directors' meetings with respect to the subject 351 transfers, that a meeting now be held and resolutions be drafted ratifying all of the prior transfers.
In December 1971, Mr. Boswell returned to Mr. Simone a draft "action in writing" ratifying the actions of Dover Downs' officers with respect to the issuance of stock to petitioner. The draft prepared by Mr. Boswell's law firm was drawn upon the assumption that no action, formal or informal, was taken by Dover Downs' board, and suggests that if there was a meeting at the time of each transfer, the draft resolution could be retyped in the present tense for each transfer, and signed. Dover Downs' board did not act to ratify the *693 transfers and sales occurring during 1970-71 until the signed action in writing dated December 13, 1971. (c) Return of Stock After Contribution. Both Mr. Gregory and Mr. Smith believed that they could not return to petitioner shares he had contributed to a corporate account without the approval of the transferee corporation's board of directors. Mr. Weaver believed it would have been a breach of his fiduciary responsibilities as an officer and director of Dover Downs to return stock without corporate resolution authorizing such return. The record discloses that there was an instance in which petitioner, through Mrs. Hambleton, authorized Mr. Gregory to sell 600 shares of petitioner's RI stock "contributed" to Dover Downs' account on December 23, 1971, 300 shares of which were confirmed sold on that date. The 600 shares were forwarded to Mr. Gregory on December 27, 1971. On February 8, 1972, 300 of those shares were transferred back to petitioner's personal account without a corporate resolution. ii. Later Years. For the later period of years in issue, 1975-78, the shares petitioner wanted to contribute were transferred to Jamaica, Dover Downs, and Jefferic anytime from a few *694 weeks to several months before the trade date. (One block of shares sold in 1978 had been contributed to Jamaica 2-1/2 years earlier in 1975.) In general, the contributed shares were already acting as collateral for loans to the corporations, although none of these shares had been transferred into any of the lender banks' names. Starting in 1975, the contributed stock was registered in the corporation's name before it was sold. The parties stipulated that petitioner transferred 352,000 shares of RI stock to Jamaica between May 1975 and June 1978. The dates the shares were sent, the number of shares sent, the bank loan they collateralized, and Jamaica's corporate minutes relating to the acquisitions for these later years have likewise been stipulated in summaries made part of this record. Jamaica's later sales were authorized in writing by Mr. Weaver. Although the summaries of RI stock sold by Jamaica for 1975-78 made by the Robinson brokerage firm do not reflect such authorization as do the summaries for the earlier years, the record contains corporate minutes authorizing such sales. Dover Downs' 1975 stock sale summary indicates that no written authorization was received from *695 Mr. Weaver for the sale of 75,000 shares of "Rollins International Inc." common stock during that calendar year. Corporate minutes record petitioner's contribution of 75,000 shares of RI common stock, and authorize its sale. The record contains nothing regarding stock sales reported by Jefferic in 1975. In 1977, RI shares sold by Jefferic had been acquired well before their sale, and each sale was authorized by Jefferic's board of directors. iii. Securities Exchange Commission Form Reporting. Petitioner's stock in RI and RLC was not subject to the SEC registration statement filing requirements until 1974. However, as director and 10-percent shareholder of both corporations, petitioner was required under SEC rule 144 (and its predecessor, rule 154) to file a Form 4, Statement of Change in Beneficial Ownership of Securities, with respect to any disposition of his unregistered RI and RLC stock. The record contains copies of the Forms 4 petitioner filed with the SEC during all of the years in issue. Prior to February 23, 1972, the instructions on Form 4 required directors or anyone who was directly or indirectly the beneficial owner of more than 10 percent of the stock of a company *696 to file a Form 4 if any change in such shareholder's beneficial ownership had occurred during the year. The instructions state that every transaction shall be reported even if only involving a change from direct to indirect ownership. Further, the fact that securities were held in the name of a broker or other nominee did not by itself constitute indirect ownership, according to the instructions. The reporting person was to state whether ownership is direct or indirect, and indicate the name or identity through which the securities were indirectly owned. On the Forms 4 filed by him during 1970-73, petitioner is listed as the direct owner of the RI and Rollins International (n.k.a. RLC) stock reported sold by Jamaica and Dover Downs during that period. Petitioner is listed as the indirect owner of only that RI and RLC stock sold by his minor children and wife during that period. Petitioner reported himself as the direct owner of the shares sold by Dover Downs and Jamaica because the date of his "contribution" of the shares coincided with their trade date in the early years, and therefore the shares were still registered in his name at the time of sale. In March 1975, petitioner *697 began reporting his contributions of RI stock to a "wholly owned Co. of John W. Rollins," as "nonmarket, private transactions," and listing himself as the indirect owner of stock sold in "open-market sales." He is listed as the indirect owner of the majority of stock sold in 1975 and half of the sales during 1976 through 1978. He listed himself as the direct owner of the remainder of the stock sold during that time. After February 1972, the instructions added that beneficially owned securities held in the name of the reporting person or in the name of a bank, broker, or nominee for the account of the reporting person should be reported as directly owned by such person. A person exercising a controlling influence over the disposition of a corporation's stock may be the indirect beneficial owner of the stock held in the corporation's name. Due to this 1972 change in the Form 4 instructions, petitioner explained his change in the method of reporting transfers and sales occurring in 1975. He understood the instructions in the earlier years to require him to report the stock registered in his name at the time of the sale as owned directly by him. C. Application of Proceeds
*698 1. Rollins Jamaica: a. Stock Sales Summary. As mentioned above, the parties prepared, stipulated, and entered as joint exhibits, summaries of stock sales reported by Jamaica in all of the years in issue. Among other things, the summaries contain the trade and settlement dates, the number of shares, price per share, and gross and net proceeds. In years beginning with 1975, the summaries frequently indicate the banks to which the stock was pledged and the amounts of principal and interest the sale proceeds paid off. Derived from those summaries, the following provides calendar year totals of gross proceeds from the sales of stock reported by Jamaica: [6]
Flowers Calendar
Industries
Year
RI stock
RLC stock
stock 1970
$   729,103
--  --
1971
1,737,689
--  --
1972
1,039,426
--  --
1973
[1] 94,724
--  --
1975
2,112,501
--  --
1976
3,966,660
$ 1,000,003
--
1977
1,047,291
--  $ 249,753
1978
730,888
--  9,000
$ 11,458,282
$ 1,000,003
$ 258,753
*699 Proceeds from stock sales made on behalf of Jamaica's account were sent by the brokers in the form of a check to Mrs. Hambleton, and checks from sales made on behalf of Dover Downs' account were sent to Mr. Weaver. The parties agree that sale proceeds were used primarily to fund operations of Jamaica's Jamaican subsidiaries in the earlier years, and to repay its loan interest and principal in the later years. b. Petitioner Loan Payable Account. Often during the earlier years in issue, when Jamaica needed money and petitioner had already sold the amount of stock permissible under the SEC regulations to be sold within a 6-month period, petitioner would borrow money from a bank, lend it to Jamaica, contribute stock, and wait until Jamaica was eligible to sell the stock to get repaid. Jamaica maintained an account *700 reflecting its liability to petitioner, hereinafter referred to as its petitioner loan payable account. The record contains a stipulated summary of the activity in this account. The summary has columns for the date, source, explanation, debit, credit, balance, and remarks. When petitioner loaned money to Jamaica, the amount is reflected as a credit entry, and had the effect of increasing the balance owed by Jamaica to petitioner. The source is often listed as "cash receipts" and the explanation as "loan". When Jamaica disbursed funds in repayment of its debt to petitioner, such amount is reflected as a debit, and reduced the outstanding balance owed to petitioner. The source listed for debit entries is "cash disb." and the explanation is a check number followed by "J.W. Rollins." The following is reproduced, with inaccuracies, from the stipulated summary to provide calendar year totals of the cash flow activity in Jamaica's petitioner loan payable account: (Payments)
(Loans)
Year
Debits
Credits
Balance
1970
$   720,650
[1] $ (1,612,977)
$ (1,349,355)
1971
709,100
(866,000)
(1,506,255)
1972
2,259,000
(835,000)
[2] (62,256)
1973
750,940
[3](1,071,684)
(403,000)
1974
510,200
(107,200)
0 1975
2,152,052
(2,926,272)
(774,220)
1976
779,220
(5,000)
0 1977
34,000
(145,500)
(111,500)
1978
3,000
(113,500)
(222,000)
*701 Other than photocopies of Jamaica's handwritten cash disbursements journals for 1970-73, the record does not contain any other information regarding Jamaica's petitioner loan payable account, e.g., a loan agreement between Jamaica and petitioner or anything indicating the rate of interest charged. The parties stipulated that Jamaica paid interest and fees to petitioner and to Associates respectively during the period 1971-76: Petitioner -
Associates -
FYE
Interest on Loans
Consulting Fees
1971
$ 125,000
$  30,000
1972
80,000
--
1974
205,233
205,000
1975
4,120
40,000
1976
--
50,000
$ 414,353
$ 325,000 (Copies of petitioners' Federal income tax returns reflect receipt from Jamaica of interest in the amount of $ 242,997 in 1970, $ 205,000 in 1971, and $ 2,548 in 1975.) The parties agree that during the period 1970-73 the source of Jamaica's repayments of petitioner's loans were funds from bank loans. Other amounts flowing from Jamaica to petitioner or petitioner-controlled entities include payment of petitioner's $ 750,000 original capitalization note in May 1974. Jamaica also maintained an account reflecting its liability to RLC. The record contains a summary *702 of the following activity in that account: (Repayments)
(Receipts)
Year
Debit
Credit
Balance
1969
---
---
$ (482,808)
1970
$ 1,124,310
$ 637,611
3,891 1971
0
3,891
0 During 1970, Jamaica received $ 1,150,000 in loans from petitioner's margin account at Dominick. Jamaica repaid this amount by a single check in 1972. c. Rollins Jamaica's Bank Loan Payable Accounts. The record contains stipulated summaries of Jamaica's loan payable accounts with the following banks: Nova Scotia, Williams & Glyn's, Continental, NBW, Shawmut, First National Bank of Memphis, FPB, Chase Manhattan Bank, Girard Bank and a loan account entitled "Barnett Ltd.". The parties agree that the proceeds from these loans were either reloaned to Jamaica's subsidiaries to develop the Jamaican projects or used to pay principal or interest on other loans (including Jamaica's petitioner loan payable account). With amounts taken from these summaries, we derived the following to provide an approximation of the cash flow activity between Jamaica and the banks during the years in issue. (Repayments)
(Receipts)
Year
Debits
Credits
1970
$   282,720
$  1,125,000
1971
282,714
1,500,000
1972
222,714
5,900,000
1973
972,714
1,500,000
1975
4,806,381
2,375,000
1976
4,132,731
938,625
1977
3,065,268
103,450
1978
606,000
50,000
$ 14,371,242
$ 13,492,075
*703 Included in the 1975 and 1976 credit totals above are Jamaica's assumptions of petitioner's personal indebtedness to three banks. Such assumptions are reflected as debit entries in Jamaica's petitioner loan payable account and credit entries in Jamaica's corresponding bank loan payable account. In the following paragraphs we outline the circumstances of these debt assumptions, the details of which are not in dispute. i. Williams & Glyn's Bank. Two of the assumptions were related to petitioner's payment of Jamaica's debt to Williams & Glyn's. Jamaica borrowed $ 2.5 million from Williams & Glyn's during 1972, which debt was originally guaranteed by petitioner and collateralized with his RI stock. In 1973 and 1974, it became necessary for petitioner's brother, O. Wayne Rollins, to pledge additional RI stock for the debt. By May of 1975, the interest on Jamaica's loan had become seriously past due. On May 7, 1975, Williams & Glyn's formally notified Jamaica that it was in default, calling for the full amount of the loan with interest due and payable immediately. On the same day, Williams & Glyn's issued to petitioner a formal notice calling upon him to honor his guarantee and *704 threatening to liquidate the collateral. Minutes of a May 14, 1975, special meeting of Jamaica's board of directors indicate that petitioner then personally borrowed $ 3.5 million from First National Bank of Atlanta. This loan was arranged and collateralized by O. Wayne Rollins. Petitioner applied the proceeds of this loan to pay $ 2,500,000 of Jamaica's outstanding principal and interest owed to Williams & Glyn's, and $ 975,000 of petitioner's own debt to Shawmut (incurred primarily for development on the island of Jamaica). Nova Scotia acted as an agent on this transaction. Jamaica's petitioner loan payable account and Williams & Glyn's loan payable account reflect petitioner's payment of $ 2,500,000 to Williams & Glyn's on Jamaica's behalf on May 28, 1975. As part of Mr. Tippie's debt consolidation, Mr. Weaver then arranged to have Jamaica assume certain of petitioner's personal loans: $ 1.625 million petitioner owed to Shawmut, and $ 500,000 he owed to NBW. ii. National Shawmut Bank. Petitioner borrowed $ 2.5 million on an unsecured basis from Shawmut in 1969 to invest in Jamaican real estate. In response to Shawmut's demand that the loan be further collateralized, O. *705 Wayne Rollins pledged 210,000 shares of his RI stock in May 1973. By March 1975, petitioner was past due on his interest payments. Sometime in May or June 1975, Shawmut asked Mr. Tippie and Mr. Weaver for additional collateral, but none was available. They discussed borrowing from another bank to reduce petitioner's loan. Finally, Shawmut agreed to exchange O. Wayne Rollins' stock for 76,000 shares of petitioner's RI stock which would be put in the name of Jamaica and sold to generate cash to repay the loan. The bank did not record this as a transfer of liability on their records. Rather, Shawmut still looked to petitioner for repayment of the outstanding balance of the loan. When market conditions improved, Jamaica sold some of the RI stock securing the loan and paid down $ 917,630 of the principal and $ 51,100 in interest during October 1975. Jamaica's petitioner loan payable account reflects a $ 1,625,000 debit "to record assumption of J.W.R.'s personal indebtedness to Shawmut Bank 7/23/75 and corresponding reduction in the company's debt to J.W.R." In the spring of 1976, Mr. Tippie prevailed upon Philip H. McLaughlin (Mr. McLaughlin), loan officer and vice president at *706 Shawmut, to allow petitioner more time to sell the collateral RI stock so that Jamaica could get the benefit of the lower tax rates after Jamaica's fiscal year ended. Mr. McLaughlin indicated that Shawmut was willing to work with petitioner so that the bank did not have to sell the RI collateral stock. By 1977, however, the bank was considering selling the collateral RLC stock it held. The outstanding balance of $ 80,364 principal was paid off with RI stock proceeds sold by Jamaica during its fiscal year 1977. Jamaica also applied the proceeds to pay off the remaining past due interest of $ 27,052 on petitioner's behalf, which amount was reflected in Jamaica's petitioner loan payable account as a reduction of Jamaica's debt to petitioner. iii. National Bank of Washington Jamaica borrowed $ 500,000 on a short-term basis from NBW in January of 1973. Petitioner personally guaranteed the loan and secured it with 54,000 shares of RI stock and 26,000 shares of RLC stock which NBW was already holding as collateral on a $ 2 million loan NBW made to Dover Downs in 1970. As of July 1975, Jamaica and Dover Downs each still owed $ 500,000 to NBW. In October 1975, as part of Mr. Tippie's *707 plan for debt consolidation, Mr. Weaver asked NBW to transfer Dover Downs' $ 500,000 loan to Jamaica, which NBW did. The transaction was cast such that petitioner first assumed Dover Downs' $ 500,000 loan and on the same day Jamaica assumed the $ 500,000 debt from petitioner. The assumption was reflected as a credit entry in Jamaica's NBW loan payable account (increasing Jamaica's liability), and a debit in Jamaica's petitioner loan payable account (reducing Jamaica's liability). With the understanding that Dover Downs' loan would be repaid through liquidation of the collateral, NBW senior vice president, Joseph R. Cassidy permitted Jamaica's assumption of Dover Downs' debt and sent the bank's treasurer to Atlanta, Georgia, to transfer petitioner's 54,000 shares of the collateral RI stock into Jamaica's name. Jamaica's NBW loan payable account reflects repayment of both debts totaling $ 1,000,000 from RI stock sale proceeds in late 1975 and early 1976. By fiscal year end 1976, Jamaica's principal liability to NBW was zero. The collateral RLC stock was returned to O. Wayne Rollins after Jamaica's debt was retired. iv. Continental Bank & Trust Throughout 1972 until fiscal year *708 end 1975, Jamaica borrowed over $ 1 million from Continental secured with petitioner's stock and personal guarantee. Petitioner personally borrowed from Continental amounts totaling $ 1,080,000 between May 1973 and May 1975. The Continental loans were cross-collateralized by 15,000 shares of petitioner's RI stock and 195,000 shares of his RLC stock as well as a personal guarantee of $ 2,000,000 on Jamaica's loan. In June 1975, petitioner requested that Continental transfer the 15,000 shares of RI stock into Jamaica's name so that it could be sold to pay down its debt. The minutes from Jamaica's June 1975 board meetings reflect petitioner's contribution to Jamaica of the stock which had secured the Continental and FPB loans. Jamaica paid down $ 280,625 of its debt to Continental with the proceeds from the sale of the 15,000 shares of RI stock in October 1975. Petitioner contributed another 25,000 shares of RI stock to Jamaica which it subsequently sold in February 1976, applying the proceeds to reduce its Continental debt by $ 633,728. A few days later in March 1976, Jamaica assumed $ 800,000 of petitioner's personal indebtedness to Continental as part of the debt consolidation *709 plan and to help reduce petitioner's outstanding loan balance of $ 1,550,000. The assumption is reflected as a $ 778,138 reduction in Jamaica's petitioner loan payable account, closely offsetting Jamaica's prior fiscal year ending balance due petitioner of $ 774,220. After the assumption, Jamaica owed Continental a total of $ 1,384,000. Petitioner paid off the remainder of his loan, and substituted 55,000 shares of RI stock held in Jamaica's name for the RLC collateral Continental held, which he directed them to send to O. Wayne Rollins, pursuant to his security interest. The RI stock was sold to pay off Jamaica's debt, $ 669,221 in December 1976, and $ 438,500 in July 1977. 2. Dover Downs: From 1970 through 1975, petitioner transferred to Dover Downs 159,000 shares of RI stock and 2,000 shares of RLC stock, which Dover Downs reported sold at a gain of over $ 4 million. The parties prepared and stipulated summaries of the RI and RLC stock sales reported by Dover Downs from which we derived the following calendar year totals for the net proceeds: Calendar
Year
RI Stock
RLC Stock
Total
1970
$ 1,140,624
$ 46,469
$ 1,187,093
1971
710,134
---
710,134
1972
806,315
---
806,315
1975
[1] 1,457,722
---
1,457,722
$ 4,161,264
*710 Petitioner readily admits the stock sale proceeds in the early years were used to repay "bridge loans" made by him when he was prevented from contributing stock to Dover Downs. The parties also agree that Dover Downs used the proceeds from the sale of petitioner's stock to service its bank debt obligations and to fund its operations. a. 1970-72. Dover Downs reported $ 2,961,006 of long term capital gains from stock sales made during 1970-72. By statutory notices of deficiency and by amended answers, respondent attributes $ 2,962,203 to petitioner. Checks for the proceeds of the stock sales made on Dover Downs' behalf by the brokers were sent to Mr. Weaver. Dover Downs' cash receipts journals reflect large sums of money received from the brokerage firms of Dominick and Laird, and from petitioner, during 1970-72. The entries reflecting receipts from petitioner sometimes bear the notation "stock", "loan", or "advance" beside his name, while other receipts from petitioner have no identifying notation. In the entries for 1970, petitioner's name has been crossed out in many places, and "Dominick & Dominick" has been written in. The majority of these entries leave unchanged the *711 notation "stock". Instead of submitting a typewritten summary of Dover Downs' petitioner loan payable account as they did for Jamaica, the parties stipulated to sets of entries in Dover Downs' cash disbursements and accounts payable journals, handwritten copies of which are part of this record. The following totals are derived from the accounts payable stipulation: Calendar
Paid to:
Year
Associates
petitioner
1970
$ 525,000.00
$   200,000.00
1971
---
230,355.97
1972
---
601,190.00
$ 525,000.00
$ 1,031,545.97
Petitioner asserts that of the amounts received by him, all but $ 45,000 represented principal or interest payments on Dover Downs' debt to him. Petitioners' Federal income tax returns reflect receipt of the following amounts of interest from Dover Downs: $ 28,064 in 1970, $ 6,797 in 1971, and $ 1,190 in 1972. [7]
*712 b. 1975. The parties prepared a summary listing Dover Downs' 1975 sales of petitioner's RI stock. Dover Downs reported total proceeds of $ 1,457,722 from RI stock contributed in June 1975, and sold in October 1975. The shares had been registered in Dover Downs' name before their sale. Cantor, Fitzgerald, Inc. and Bear Stearns were the only brokers used. The parties stipulated that during 1975 Dover Downs' cash disbursements journal reflects payments to petitioner of $ 131,502.34 and to Associates of $ 37,500, totaling $ 169,002.34. Petitioners' 1975 Federal income tax return reflects receipt of $ 64,282 of interest from Dover Downs. First Pennsylvania Bank began making loans to Jamaica and Dover Downs in 1969. These loans were guaranteed by petitioner and secured by his RI and RLC stock, as well as 74 percent of the stock of Jamaica's subsidiary, Rose Hall, Ltd. By May 1973, Dover Downs had borrowed $ 5,500,000 from FPB, secured by Dover Downs' real estate and physical plant, and guaranteed by petitioner to the extent of all the interest and $ 2,225,000 of the principal. Throughout 1974 and into 1975, petitioner borrowed money from FPB, the majority of which he reloaned *713 to Dover Downs to service its debt to FPB. As stated earlier, the record does not contain a stipulated Dover Downs' petitioner loan payable account summary or any other information regarding petitioner's loans to Dover Downs. By June 1975, Dover Downs' corporate minutes indicate that it owed petitioner $ 1,147,000, and petitioner owed FPB $ 1,965,000. As of April 1975, Jamaica also owed FPB $ 3 million of principal. In the summer of 1975, Mr. Weaver worked out a refinancing package with FPB implementing Mr. Tippie's debt consolidation plan whereby the bank increased its mortgage loan to Dover Downs by $ 1,025,000 and loaned Dover Downs an additional $ 1,965,000 on a demand basis secured by 75,000 shares of petitioner's RI stock contributed by him to Dover Downs in June 1975. Dover Downs' corporate minutes of a June 1975 meeting indicate that the proceeds of the $ 1,965,000 loan were to be used by Dover Downs to retire petitioner's indebtedness of the same amount to FPB originally incurred by him to meet Dover Downs' debt service requirements. Corporate minutes from another June 1975 meeting indicate that Dover Downs accepted petitioner's capital contribution of 75,000 shares *714 of RI stock, crediting them as paid-in surplus, and authorizing their sale. The proceeds from the sale of the 75,000 shares were used to retire the new demand loan. The 75,000 contributed shares were the same ones that were serving as collateral with the bank. FPB's documentation of the refinancing plan indicates that Dover Downs first reduced the new $ 1,965,000 demand loan indebtedness by $ 465,000 from the proceeds of the new $ 1,025,000 mortgage loan. The balance of the demand loan was repaid from the proceeds from the sale of the collateral stock totaling $ 1,457,721. Since Dover Downs owed petitioner only $ 1,147,000, according to Dover Downs' corporate minutes, and it paid petitioner's debt in the amount of $ 1,965,000, petitioner owed Dover Downs the difference of $ 818,000. Corporate minutes from a July 1975 meeting indicate that petitioner had repaid $ 85,000 of the difference, and then assumed other debts of Dover Downs including $ 500,000 of Dover Downs' loan outstanding from NBW, which in turn was assumed by Jamaica. 3. Jefferic Enterprises: By amended answers, respondent reallocated to petitioner $ 839,573 and $ 320,157 of capital gains from stock sales reported *715 by Jefferic in 1975 and 1977, respectively. After concessions, only 1977 is left in issue. Beginning in 1969, Jefferic borrowed money from IVB, collateralized by 43,000 shares of petitioner's RI stock, 66,000 shares of his RLC stock, and some shares of his Flowers Industries, Inc. stock. By July 1974, Jefferic owed IVB principal of $ 800,000 with monthly interest of approximately $ 10,000. When Jefferic fell behind with its debt service payments, IVB became very anxious for repayment. IVB was not amenable to working out the debt and was instead pressing for sale of the collateral stock. Subsequent to a demand for payment by IVB, petitioner contributed the 43,000 shares of collateral RI stock to Jefferic, which was subsequently sold and the proceeds applied to Jefferic's debt to IVB. Jefferic's 1975 Form 1120, Schedule D, shows 43,000 shares of RI stock sold for a gain of $ 839,573. These sale proceeds are not in issue. Jefferic borrowed $ 2.5 million on a demand basis from Continental-Illinois National Bank in March 1973. This loan was guaranteed by petitioner and secured by a first mortgage on Jefferic's real estate. Jefferic guaranteed a $ 2.5 million loan to petitioner *716 from CINB in April 1973. These loans were cross-guaranteed and cross-collateralized. Jefferic sold some of the mortgaged land to make a principal payment such that the principal balance on Jefferic's loan was $ 2,461,500 as of April 1975. The record contains a stipulated summary of Jefferic's sales of petitioner's RI stock in 1977. Jefferic reported net proceeds totaling $ 320,157, of which $ 294,236.62 were applied to Jefferic's debt to CINB. D. Rollins Brothers Partnership
The Partnership realized a loss in the cattle breeding activity, and a profit in the Lear jet leasing activity, netting out to overall losses on the Partnership's 1967 and 1968 Federal income tax returns. The parties stipulated that petitioner paid $ 153,864 and $ 151,315.28 during 1967 and 1968, respectively, to rent the Lear jet from the Partnership. The rental amounts were listed as Associates' travel and promotion expenses on petitioner's 1967 and 1968 Schedule C for those years, and reported as income on the Partnership's 1967 and 1968 Forms 1065. By deficiency notice, respondent disallowed almost all of Associates' claimed travel and promotion expenses in 1967 and 1968. The parties have *717 agreed to an adjustment whereby petitioner's income is increased by two-thirds of the total amount of the deductions disallowed to Associates as personal expenses of petitioner. Petitioner reserved the right to argue at trial that two-thirds of the Lear jet leasing expenses paid by Associates to the partnership in 1967 and 1968 should either be subject to an additional 50 percent allowance as a deduction, or alternatively, petitioner's share of partnership income should be reduced by his share of such disallowed expenses as an equitable adjustment. ULTIMATE FINDINGS OF FACT During all the years in issue, petitioner was a controlling shareholder of Jamaica, Dover Downs, and Jefferic. Throughout the years in issue, Jamaica and Dover Downs needed cash to meet their operating expenses. To meet the corporations' financial needs in the early years, 1970-73, petitioner purported to contribute stock to Jamaica and Dover Downs with the express intention that it be sold immediately. Such stock was never registered in either corporation's name, and in fact was sold by the brokers on petitioner's or Mr. Weaver's direction before the stock certificates were physically received by the brokers. *718 Although in the earlier years the stock was transferred to generate cash for the operations of Dover Downs, Jamaica and its Jamaican subsidiaries, proceeds were also used to repay the controlled corporations' debt to petitioner. Petitioner was the true seller of the RI and RLC stock reported sold by Jamaica and Dover Downs during the period 1970-73. In the later years, 1975-78, stock contributed by petitioner to Jamaica, Dover Downs, and Jefferic was registered in the corporate name and held by the corporation for some period of time before it was sold. The parties agree that the proceeds from the stock sales repaid interest and principal on the loans of Jamaica, Dover Downs, and Jefferic, that the stock had collateralized in the later years. Jamaica, Dover Downs, and Jefferic were the true sellers of the stock sold during 1975-78. OPINION A. Law
Petitioner cast the form of each transaction in issue as a contribution of his appreciated RI and RLC stock to Jamaica, Dover Downs, or Jefferic followed by the recipient corporation's sale of the stock. It is well established that the substance and not the form of a transaction controls its tax consequences. Gregory v. Helvering, 293 U.S. 465, 469-470 (1935); *719 Penrod v. Commissioner, 88 T.C. 1415, 1427 (1987). The critical issue we must decide is whether petitioner or his controlled corporations are properly taxable on the gains from the stock sales in each of the years in issue. Respondent presents four alternative arguments that income reported by petitioner's controlled corporations from the sale of the contributed stock should be allocated to petitioner. Respondent invokes the doctrines of substance over form, step-transaction, assignment of income, and clear reflection of income under section 482. Generally the burden of proof is on petitioner to prove that respondent erred in determining that petitioner is taxable on the stock sale proceeds. Rule 142(a). As indicated supra at p. 5, respondent bears the burden of proving the increased deficiencies and the application of section 482 to petitioner's taxable years 1970-72. Generally the transfer of appreciated property to a corporation in exchange for its stock is a sale or disposition of property within the meaning of section 1001(a). The transferor realizes gain in the amount of the excess of the transferred property's fair market value over *720 its basis under section 1001(c), unless the transaction is covered under one of the nonrecognition provisions of the Code. Under section 351, a transferor does not recognize gain or loss when property is transferred to a corporation solely in exchange for that corporation's stock or securities, if the transferor controls such corporation immediately after the exchange. The transferor's basis in the transferred property carries over to become the transferee corporation's basis under section 362. Section 351 in conjunction with section 362 (providing for the carryover of basis from the transferor to the transferee) operates as a nonrecognition provision for the gain inherent in the appreciated property upon its contribution. Section 351 does not grant an exemption from tax, rather, it defers recognition of tax until a gain is clearly realized by a future taxable disposition of the property. The basic premise of section 351 is that a transfer of appreciated property to a corporation controlled by the transferor operates as a change in the form of ownership such that the transferor still retains a beneficial interest in the transferred property. The taxpayer has not really "cashed *721 in" on the gain inherent in the property. Portland Oil Co. v. Commissioner, 109 F.2d 479, 488 (1st Cir. 1940), affg. 38 B.T.A. 757 (1938). When pursuant to section 351, a shareholder transfers to a controlled corporation appreciated property which is subsequently sold by the corporation in a taxable transaction, a form of income shifting can occur. Foster v. Commissioner, 80 T.C. 34, 145 (1983), affd. on this issue, 756 F.2d 1430 (9th Cir. 1985). The transaction is scrutinized to see whether the whole transaction effects a change in ownership such that the transferor has "cashed in" the property's unrealized gain. If so, the nonrecognition provisions of section 351 are inapplicable, and the transaction is treated as a direct sale of the property by the transferor. The conduit analysis, a subset of the substance-over-form doctrine, is the traditional approach to these kinds of transactions and is a well-established case law doctrine having as its origin Commissioner v. Court Holding Co., 324 U.S. 331 (1945). In this seminal case involving *722 the transfer of property between a corporation and its shareholders, the Supreme Court imputed to a corporation gain from a shareholder sale of distributed property. Two controlling shareholders of the corporation negotiated with a third party for the sale of an apartment building, the corporation's only asset, 4 months before the corporation distributed it to them. The corporation sought to avoid triggering gain from the sale at the corporate level, and to avail itself of nonrecognition of income treatment upon a liquidating distribution. The Supreme Court determined that the sole reason the corporation transferred the asset to its shareholders was tax avoidance. The oft-quoted language from the Supreme Court's opinion follows: The incidence of taxation depends upon the substance of a transaction. The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant. A sale by one person cannot be transformed for tax purposes into a sale *723 by another by using the latter as a conduit through which to pass title. To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress. [Commissioner v. Court Holding Co., supra at 334; fn. ref. omitted.]
In Minnesota Tea Co. v. Helvering, 302 U.S. 609 (1938), shareholders were held to be mere conduits for transmitting funds to corporate creditors where the shareholders agreed to pay corporate debts with cash distributed by the corporation to them as dividends. Because the corporation would have had to pay tax on the money had it paid its creditors directly, the Supreme Court said: "A given result at the end of a straight path is not made a different result because reached by following a devious path". Minnesota Tea Co. v. Helvering, supra at 613. Although taxpayers ordinarily may not, through form alone, achieve tax advantages which substantively are not within the intent of the Code, Commissioner v. Court Holding Co., supra; *724 Gregory v. Helvering, 293 U.S. at 469; they do have the right to minimize taxes as far as the law allows. United States v. Cumberland Public Service Co., 338 U.S. 451, 455 (1950). Commissioner v. Court Holding Co., supra, was distinguished in Cumberland Pub. Serv. Co., where the Supreme Court respected a transaction structured as a shareholder sale of distributed corporate assets. In Cumberland Pub. Serv. Co., a closely held corporation wanted to avoid a direct sale of electrical power equipment to the corporation's competitor who had refused to buy the corporation's stock. The corporation instead distributed the equipment in partial liquidation to its shareholders who immediately sold it to the competitor. Despite the presence of a tax-avoidance motive (no corporate-level realization of gain inherent in the asset and nonrecognition of gain upon liquidating distribution), the Supreme Court found the sale was made by the shareholders because the corporation never intended to make the sale itself. The Supreme Court reasoned that the conduit analysis cannot be applied to tax *725 a corporation when the sale has been made by its stockholders following a genuine liquidation and dissolution. While the distinction between a corporate sale and a shareholder sale preceded by a distribution in kind, may be particularly shadowy and artificial when the corporation is closely held, the Supreme Court noted that Congress chose to recognize such a distinction for tax purposes. The Supreme Court accepts as Congress' mandate that different tax consequences shall flow from different methods by which shareholders of a closely held corporation may dispose of corporate property. "It is for the trial court, upon consideration of an entire transaction, to determine the factual category in which a particular transaction belongs." United States v. Cumberland Pub. Serv. Co., supra at 456. Indeed, where "There [is] evidence to support the findings of the Tax Court, its findings must therefore be accepted by the courts." Commissioner v. Court Holding Co., supra at 333-334 (citations omitted). We observe that in a case involving a distribution of appreciated property out of corporate solution, this Court held *726 that where the sale of distributed property at the corporate level would not produce the type of operating profits which arise in the normal course of everyday business, a factual finding that the corporation, not the shareholder, in substance sold the distributed property is essential to successfully imputing income to the corporation. In Anderson v. Commissioner, 92 T.C. 138 (1989), the shareholder caused stock that he previously contributed to the corporation to secure its debt to be distributed to him so that he could sell it to improve his own financial situation. This Court refused to impute the income to the corporation where nothing in the record suggested the corporation participated in the sale of the stock. Prior to the repeal of General Utilities & Operating Co. v. Helvering, 296 U.S. 200 (1935), by the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, the impetus for corporate distributions of appreciated property was the potential for circumventing two levels of tax (at the corporate and shareholder levels). See United States v. Cumberland Pub. Serv. Co., supra. *727 Parallel to the use of the former Code's nonrecognition for liquidating distributions section to transfer appreciated property out of corporate solution, is use of the nonrecognition provision of section 351 for contributions of appreciated property into corporate solution. If the corporation subsequently sells the transferred appreciated property, the realization of gain inherent in the property shifts from the shareholder to the controlled corporation. The advantages of such a transfer increase proportionately with the amount of the property's appreciation and the availability of the corporation's net operating losses to offset the gain upon the property's subsequent sale. In the area of transfers of property between shareholders and their closely held corporations there are many factual variations. Slight differences in procedure can lead to substantial differences in the tax treatment of the transactions, and it is often difficult to identify the "substance" that is supposed to control over the "form". Uniroyal Inc. v. Commissioner, T.C. Memo. 1993-214. The cases herein being considered involve petitioner's multiple transfers of appreciated *728 stock to his various controlled corporations whose substantial net operating losses (NOL's) offset the gain recognized on the subsequent sales of the stock over a span of years. It is important to keep in mind the basic principle that each taxable year must stand on its own merits and be considered separately for Federal income tax purposes. United States v. Skelly Oil Co., 394 U.S. 678, 684 (1969); Burnet v. Sanford & Brooks Co., 282 U.S. 359, 365 (1931). The issue is whether the form of each transaction is an accurate reflection of its substance -- whether in each year in issue the corporations on whose accounts the stock was sold were actually the true economic vendors of the property, or whether they acted as conduits through which title to the property passed. The conduit analysis has been applied and developed in several Tax Court cases in which controlling shareholders have transferred appreciated stock to their corporations. The first in this line of cases is Abbott v. Commissioner, T.C. Memo. 1964-65, affd. per curiam 342 F.2d 997 (5th Cir. 1965). *729 There, a taxpayer transferred appreciated stock to one of his controlled corporations which acted as an intermediary under a contract providing for the stock's sale to another controlled corporation. We decided such transfer to be without any business purpose except for the reduction of taxes by offsetting the gain from the sale of stock against the transferee corporation's loss carryovers. Although the proceeds were used in its operations, this did not provide a sufficient business purpose, and the transferee corporation was determined to be a mere conduit through which title passed for tax purposes. In these circumstances, we held that the gain was taxable to the taxpayer and not to the intermediate transferee corporation. Next came Palmer v. Commissioner, 44 T.C. 92 (1965), affd. per curiam 354 F.2d 974 (1st Cir. 1965), in which the taxpayer-shareholders mortgaged some of their own real property as collateral for the corporate debt of their already heavily indebted closely held corporation. The taxpayer-shareholders then contracted to sell the property, received partial payment from the buyers, transferred the property *730 to the corporation for it to sell, and used the sale proceeds to repay the corporate debt. This Court found that utilizing corporate NOL's to offset capital gain was not a sufficient business purpose to respect the transfer since it was subject to the sale, and the corporation served only to pass along title. Id. at 95. Abbott v. Commissioner, supra, and Palmer v. Commissioner, supra, provide a foundation for the requirement that the transfer of appreciated property to a controlled corporation serve a valid business purpose. Invalid purposes include funding the corporation's operations and utilizing the corporation's NOL's. The business purpose requirement is further refined in this Court's application of the conduit analysis in three cases containing factual similarities to the instant cases: Hallowell v. Commissioner, 56 T.C. 600 (1971); Stewart v. Commissioner, T.C. Memo. 1982-209, affd. 714 F.2d 977 (9th Cir. 1983); Smalley v. Commissioner, T.C. Memo. 1973-85. *731 As both parties are relying on these cases and we find them to be controlling, they bear close scrutiny, and we therefore discuss the facts and reasoning in greater detail. In Hallowell v. Commissioner, supra, taxpayer Hallowell transferred appreciated stock to his family-owned corporation, which had NOL carryovers. The transfers were effected through a broker who maintained separate accounts for Hallowell and the corporation. Over a period of 3 taxable years, Hallowell caused the broker to transfer some of Hallowell's appreciated marketable securities held in a nominee owner's street name from Hallowell's personal account to the corporate account. These shares were then sold by the broker within a few days, weeks, or months, and the gains were reported by the corporation. Throughout the 3 years in issue, the corporation made unreimbursed distributions for the benefit of Hallowell and his spouse which were recorded on the corporate books as debits to an asset account set up in the Hallowells' name. At the end of two of the years, the debit balance of that asset account was approximately offset by a credit entry representing the corporation's *732 payment in full of notes for amounts previously loaned to the corporation by the Hallowells. For the 3 years in issue, the corporation reported the following totals: $ 72,736 of gain from stock sales, $ 68,807 in distributions for shareholders' benefit, and $ 67,000 of notes credited as repaid. This Court in Hallowell v. Commissioner, supra, listed the cases following Commissioner v. Court Holding Co., 324 U.S. 331 (1945), involving corporate distributions of appreciated property followed by shareholder sales, and those involving shareholder transfers of property into the corporate solution for sale including United States v. Cumberland Pub. Serv. Co., 338 U.S. 451 (1950). In concluding that the Hallowells should be charged with gain from the sales, we considered the following factors: The brief interval of time between the stock's transfer and its sale; and the distributions to the Hallowells which roughly corresponded with the gain derived annually from the stock sales. This Court applied the conduit analysis to hold that although no one aspect of the transaction may be a "sham", *733 the transaction must be viewed as a whole to determine whether in substance the transferee corporation was a conduit for the transferor-shareholder. This Court answered the taxpayers' argument that the distributions served a valid business purpose of reducing corporate indebtedness by stating that the concept of business purpose may not be particularly meaningful in the context of a closely held corporation. The distributions for the Hallowells' benefit were of overriding significance in deciding whether they ought to be charged with the gain realized on the stock sales. The Court observed that a financially troubled corporation's payment of obligations to those who control its affairs amounts to distributions for their benefit. Hallowell v. Commissioner, supra at 609 n.5. A taxpayer was able to successfully rebut the conduit analysis in Smalley v. Commissioner, T.C. Memo. 1973-85. The taxpayer and his spouse in Smalley were controlling shareholders of a closely held NOL corporation with $ 268,000 of bank debt secured by taxpayer's appreciated stock in the Hertz Corporation. The majority shareholder of another *734 corporation, with whom the taxpayer was discussing the possibility of a merger, warned him that the Smalley Corporation's long-term liabilities were an obstacle and urged him to "clean up" the corporation's balance sheet. Without making a formal threat to call the loan, the bank also expressed concern over the level of the corporation's indebtedness to it. The taxpayer transferred 3,300 of the hypothecated Hertz shares to the corporation, which it then sold. The transfers and sales of the Hertz stock were effected through a broker maintaining accounts for both the taxpayer and the corporation. Of the $ 133,850 total sales proceeds, $ 80,000 was applied to repay the corporation's commercial loans; $ 38,000 went into the corporate accounts; and $ 15,200 was used to repay loans made by the taxpayer to the corporation. During the year in issue, the taxpayer also sold some of the hypothecated Hertz stock on his own account, and used the proceeds to repay corporate debt. Initially, $ 118,000 was recorded on the controlled corporation's books as an investment in Hertz stock and as a repayment of the corporation's debt to the taxpayer. Several adjusting journal entries were made on *735 the corporation's books with respect to the stock transfers and sales. This Court held that the corporation was not a conduit for the stock; rather, the taxpayer made a contribution of 3,300 shares of Hertz stock to the corporation which it then sold. This Court reasoned that a lender strongly advocating reduction of corporate indebtedness and a potential business partner requiring reduction of liabilities on the balance sheet for a successful merger, together furnished sufficient nontax purposes for contributing the stock to the capital of the corporation. A taxpayer, this Court noted, is not required to choose the more costly method of contributing cash to his corporation if he has good nontax purposes for using personal assets, especially where the contributed asset is stock already securing corporate debt. This Court distinguished Abbott v. Commissioner, T.C. Memo. 1964-65, affd. per curiam 342 F.2d 997 (5th Cir. 1965), and Hallowell v. Commissioner, supra, by observing that the transaction in the former had no business purpose other than the reduction of taxes, and in the latter, *736 resulted in personal gain to the taxpayer. The taxpayer in Stewart v. Commissioner, T.C. Memo. 1982-209, affd. 714 F.2d 977 (9th Cir. 1983), had the controlling interest in a NOL manufacturing corporation to which he loaned and caused his other controlled corporations to lend substantial sums. The taxpayer personally guaranteed all of the manufacturing corporation's loans and subordinated his own claims to those of other creditors. In a series of transfers made during 1967, the taxpayer contributed to the corporation appreciated stock, which it sold on the day of receipt. The record established that of the $ 228,000 net proceeds, the corporation retained only $ 35,000 (13 percent) for its own use. The rest of the proceeds was distributed in the form of loan repayments to the taxpayer, his controlled businesses, and a bank not a creditor of the corporation. (One distribution to the taxpayer's sole proprietorship in the amount of $ 74,835 was 12 times larger than the corporation's debt to such entity.) Although a taxpayer is entitled to minimize his tax liabilities by any lawful means, this Court noted that the steps he *737 takes to do so must have a valid business purpose apart from tax-savings motives. Reviewing the facts and circumstances distinguishing Smalley v. Commissioner, supra, from Abbott v. Commissioner, supra, and Hallowell v. Commissioner, 56 T.C. 600 (1971), in our opinion in Stewart v. Commissioner, supra, we noted that the taxpayers in Hallowell realized personal gain in the form of loan repayments; and the transfer in Abbott served no business purpose other than reducing taxes. On the other hand, the taxpayer in Smalley had both a strong business purpose and benefited personally only to the extent that the stock sale was a prerequisite to the continued business negotiations with an unrelated third party. Indeed, this Court observed that Smalley illuminates those facts and circumstances that would justify the contribution by a taxpayer of large amounts of stock to a closely held corporation. Since taxpayer Stewart and his controlled entities received the stock sale proceeds, and not the corporation or its outside creditors, we concluded that the record in *738 Stewart did not contain convincing evidence of a valid business purpose for the formalistic transfer of stock to the corporation. Stewart v. Commissioner, T.C. Memo 1982-209, affd. 714 F.2d 977 (9th Cir. 1983). Citing United States v. Cumberland Pub. Serv. Co., 338 U.S. 451 (1950), the Court of Appeals for the Ninth Circuit in Stewart affirmed this Court's factual findings that the distributions and loan repayments were without business purpose, and that they were not made to accommodate the interests of an unrelated investor or creditor. Addressing the taxpayer's section 351 argument, the court observed that the section was enacted to permit taxpayers to avoid recognizing income upon making capital contributions when such shareholders transferred ownership of property without actually "cashing in" on the gain or loss inherent therein. Taxpayer Stewart "cashed in" on the value of the appreciated stock as the corporation immediately distributed the majority of the sale proceeds back to him and his controlled entities. Thus, an entity will not be treated as a conduit if the parties to *739 the transaction respect formal distinctions and the transaction serves a valid corporate business purpose. P.R. Farms Inc. v. Commissioner, 820 F.2d 1084, 1087 (9th Cir. 1987), affg. T.C. Memo. 1984-549, citing Stewart v. Commissioner, supra.
We note that this Court has held that the absence of a direct personal benefit to the taxpayer who transfers appreciated property is not a bar to allocating income from the sale of the property to such transferor. Recklitis v. Commissioner, 91 T.C. 874, 898-900 (1988). In the cases under consideration, respondent argues that like the taxpayers in Stewart v. Commissioner, supra, and Hallowell v. Commissioner, supra, petitioner used his controlled corporations as conduits through which to pass title of the appreciated stock. Respondent also argues that the stock sale proceeds are properly allocable to petitioner under the step-transaction doctrine (whereby the contribution step should be ignored), and under the assignment of income doctrine (because he cashed in on the stock, the gain from the stock sale *740 proceeds is his). Alternatively, respondent seeks to reallocate the gain from the stock sales to petitioner under section 482. Section 482 provides respondent with the authority to distribute or allocate income or expenses between "two or more organizations, trades, or businesses * * * owned or controlled * * * by the same interests, * * * if she determines that such * * * allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses." The purpose of section 482 is "to deny the power to shift income or deductions arbitrarily among controlled corporations". Central Cuba Sugar Co. v. Commissioner, 198 F.2d 214, 216 (2d Cir. 1952), affg. in part, revg. in part 16 T.C. 882 (1951). Transactions between controlled taxpayers will be subjected to special scrutiny to ascertain whether the common control is being used to reduce, avoid, or escape taxes by shifting or distorting income, deductions, credits or allowances. Sec. 1.482-1(c), Income Tax Regs.Section 482 may be applied in circumstances described in sections of the Code such as section 351 *741 providing for the nonrecognition of gain or loss. National Securities Corp. v. Commissioner, 137 F.2d 600 (3d Cir. 1943), affg. 46 B.T.A. 562 (1942); G.D. Searle & Co. v. Commissioner, 88 T.C. 252, 360 (1987); sec. 1.482-1(d)(5), Income Tax Regs.
Under section 482, respondent may reallocate income between related parties if a transaction is without a valid business purpose and solely to avoid taxation. The desire to maximize the benefits of NOL's is not the sort of nontax motive that the term "business purpose" denotes in this context. Dolese v. Commissioner, 82 T.C. 830, 840-841 (1984), affd. 811 F.2d 543 (10th Cir. 1987). In the absence of a tax avoidance motive, respondent may also compel a reallocation to clearly reflect the income of a controlled taxpayer who in substance earned the income. A reallocation under section 482 will be upheld even if transactions have a motivating nontax business purpose but the reallocation is necessary to clearly reflect income. Central Cuba Sugar Co. v. Commissioner, supra at 216. *742 The parameters for reallocating income under section 482 and for disregarding the form of transaction under the Commissioner v. Court Holding Co., 324 U.S. at 331, conduit analysis are substantially the same. This Court has observed that if the result sought by respondent can be reached by relying on Commissioner v. Court Holding Co., and its progeny, all the prerequisites for a section 482 allocation are present. Southern Bancorporation v. Commissioner, 67 T.C. 1022, 1026 (1977). Under section 482, the relevant inquiry is whether the proceeds from the sale of the transferred property must be allocated to the transferor "in order to prevent evasion of taxes or clearly to reflect . . . income." To rebut such a determination by the Commissioner, the taxpayer must establish that not attributing the gain to the taxpayer more clearly reflects the proper allocation of income. To do so, he would be required to establish that he did not "cash in" on the gain -- in effect, that the transaction was of the kind intended to receive nonrecognition treatment under section 351. Similarly, under what is described as *743 the substance-over-form doctrine, the controlling inquiry is whether the corporate recipient was merely a conduit for the sale of assets by the transferor; if so, the transferor "cashed in" on the gain, and nonrecognition treatment is inappropriate under section 351. [Stewart v. Commissioner, 714 F.2d at 989.]
Ordinarily a taxpayer must meet a heavier than normal burden of proof and demonstrate that respondent's determinations under section 482 are arbitrary, capricious, or unreasonable, for this Court to redetermine the deficiencies. Foster v. Commissioner, 80 T.C. 34, 143 (1983), affd. on this issue 756 F.2d 1430 (9th Cir. 1985). Here, however, respondent bears the burden of proving the correctness, under section 482, of his reallocations of gain from stock sales reported by Jamaica and Dover Downs in 1970-72. Petitioner bears the burden of proof for all other years in issue with respect to section 482. As a threshold matter, petitioner contends that he falls into the one situation susceptible to a substance-over-form argument but for which an allocation under section 482 is not applicable: *744 where the transaction at issue is not between two or more organizations, trades, or businesses within the meaning of section 482. See Foglesong v. Commissioner, 691 F.2d 848 (7th Cir. 1982), revg. 77 T.C. 1102 (1981); Stewart v. Commissioner, 714 F.2d at 989; Perryman v. Commissioner, T.C. Memo. 1988-378, affd. without published opinion 920 F.2d 936 (9th Cir. 1990). Petitioner maintains that he is a mere investor with respect to his RI and RLC stock, and therefore not engaged in an activity rising to the level of a trade or business. Petitioner cites Higgins v. Commissioner, 312 U.S. 212 (1941), which held that the activity of investing by an individual was not a trade or business for purposes of deducting expenses under the predecessor of section 162. We find petitioner's reliance on Higgins somewhat at odds with his position since the record contains a memorandum of law prepared by petitioner's counsel during an audit arguing that petitioner's unincorporated managing and consulting business, Associates, *745 should be viewed as a separate trade or business for purposes of deducting expenses in the years in issue. Petitioner has reported Associates' income on Schedule C for all of the returns filed during the years in issue. Furthermore, both petitioner and Mr. Weaver have described petitioner as being in the business of founding companies and developing them to sell off to the public. The question of whether the activities of a taxpayer constitute carrying on a trade or business is largely one of fact, the solution of which "requires an examination of the facts in each case." Higgins v. Commissioner, 312 U.S. at 217. Petitioner is a man of many activities and investments, and, as the findings of fact clearly show, he has worn multiple hats during the years in issue. Indeed, the question of what role petitioner played in the transactions involved goes to the very heart of the main issue to be decided. In his brief petitioner states that he is in the business of forming and developing new businesses. He capitalizes new ventures and develops them by making further equity and debt investments, while helping them to get independent financing by personally *746 guaranteeing their bank debt and securing such debt with pledges of his stock in other entities. Indeed, this is the process he used to develop both RI and RLC, and less successfully, Jamaica, Dover Downs, and Jefferic. The record is replete with evidence that petitioner was considerably more than a mere investor in his various ventures -- during the years in issue through Associates he actively engaged in promoting, financing, and managing Jamaica, Dover Downs, and Jefferic. See Giblin v. Commissioner, 227 F.2d 692 (5th Cir. 1955), and the cases cited therein. Furthermore he served on the board of directors and was an officer of both RI and RLC, receiving substantial salaries from both of them during some of the years in issue. Finally, he lists his occupation as "executive" on each of his Federal income tax returns for the years in issue. This Court has held that a corporate executive who receives a salary for his services is engaged in a trade or business for purposes of section 482. Dolese v. Commissioner, 82 T.C. at 839. Petitioner's developing and consulting business, Associates, is a separate and distinct *747 business from those of RLC, RI, Jamaica, Dover Downs, and Jefferic. That he is an investor in each of them does not negate the fact that he carries on business activities with regard to them within the meaning of section 482. Accordingly, we hold that respondent's allocations are clearly being made between the requisite two organizations, trades or businesses, and that, if all other requirements of the two theories are met, the conduit analysis of Commissioner v. Court Holding Co., 324 U.S. 331 (1945), and clear reflection of income provisions of section 482 are equally applicable. B. Analysis
In considering the entire record it is our task to determine the factual category into which each transaction in issue falls: whether petitioner's corporations were in fact the true economic vendors of the stock, or rather, served as conduits through which title of the stock passed. Since resolution of this issue involves reallocation of gain reported by three different corporations from transactions spanning 9 years, we have divided the transactions into three categories. The stock reported sold by Jamaica and Dover Downs for years prior to 1974 was *748 transferred and sold in a substantially similar manner. The circumstances surrounding the transactions occurring after 1974 involving the two corporations were quite different from those in the earlier years, as were the transactions themselves. We therefore divide consideration of Jamaica's and Dover Downs' transactions into two parts: the earlier period of taxable years 1970-73, and the later period 1975-78. As only 1 year in the later period involves Jefferic, we will examine it separately in a third category. We observe at the outset that the regulations prescribe that every taxpayer receiving stock of a controlled corporation in exchange for property under section 351 shall file with that taxpayer's income tax return for the year in which the transfer took place, a complete statement of all facts pertinent to the transfer. Utley v. Commissioner, 906 F.2d 1033, 1037 (5th Cir. 1990), affg. in part and remanding on another issue per curiam T.C. Memo. 1988-575; sec. 1.351-3(a), Income Tax Regs. None of petitioner's returns filed for any of the years in issue contains a statement detailing petitioner's contributions of *749 stock to Jamaicaa, Dover Downs, and Jefferic, nor do the controlled corporations' returns contain any such statements. Sec. 1.351-3(b), Income Tax Regs.
We note also that the exchange requirements of section 351 (property for stock) are satisfied when a sole shareholder transfers property to a wholly-owned corporation even though no stock is issued therefor. Issuance of stock by a wholly-owned transferee corporation in exchange for a sole shareholder's contributions would be a meaningless gesture where the sole shareholder's proportionate interest remains unchanged, and is therefore not required for the transaction to qualify under section 351. Lessinger v. Commissioner, 85 T.C. 824, 831-832 (1985), affd. on this point 872 F.2d 519, 522 (2d Cir. 1989); Atlas Tool Co. v. Commissioner, 70 T.C. 86, 97 (1978), affd. 614 F.2d 860, 865 (3d Cir. 1980). 1. The Early Years 1970-73 From 1970 to 1973 petitioner purportedly contributed stock worth $ 3.6 million to Jamaica and $ 2.9 million to Dover Downs, which both corporations reported selling immediately. The transactions *750 during this period must be viewed as a whole from the commencement of the purported contributions to the consummation of the stock sales. Commissioner v. Court Holding Co., supra.Each transfer of stock was precipitated by the transferee corporations' need for working capital. After determining the number of shares to sell to generate the amount of cash needed, petitioner and Mr. Weaver orchestrated the contribution and sale concurrently during a phone call to the broker. The interval between the commencement of the transfer of stock to the consummation of its sale was extremely short during the early years. The brokers sold the stock the same day as the telephone call or within a few days, before the stock powers and certificates had time to physically reach the broker. Since title to the stock never had time to be registered in Jamaica's or Dover Downs' name or in a street name as nominal owner, petitioner was still listed as the owner at the time of all of the sales during 1970-73. He therefore listed himself as the direct owner of all stock sold during those early years for SEC reporting purposes. The form of the transactions as now cast *751 by petitioner is questionable. He did not attempt to adhere to formalisms that would distinguish the stock sales as having been made by the corporations rather than by him. In most of the transfers he ordered the contribution and the sale at the same time, and in Dover Downs' case, without prior written authorization from the transferee corporation. Like the taxpayers in Hallowell v. Commissioner, 56 T.C. 600 (1971), and Stewart v. Commissioner, T.C. Memo. 1982-209, affd. 714 F.2d 977 (9th Cir. 1983), petitioner controlled the corporations to which he was purportedly transferring the appreciated stock. Thus, in any given transaction petitioner was wearing two hats, acting on his own behalf as well as on behalf of the corporations. Both brokers, Mr. Smith and Mr. Gregory, remember speaking daily with petitioner during these years with regard to Jamaica's, Dover Downs', and petitioner's personal accounts. Both brokers said that they sold stock on Dover Downs' account on petitioner's order even though he was not a listed officer of Dover Downs authorized under the brokerage agreements. Dover *752 Downs' board authorization of the sales was received by the brokers well after the sales took place. We note that petitioner was a listed officer authorized to act on Jamaica's behalf under the brokerage agreements, and Jamaica's board authorized all stock sales. Even so, petitioner handled Jamaica's transactions identically to those involving Dover Downs so that it is difficult to determine on whose behalf he was acting at any given time. Furthermore, like the transactions in Hallowell v. Commissioner, supra, the interval of time between the stock's purported contribution and its sale was so brief that the stock certificates often did not reach the brokers before they had to be tendered for settlement. Thus, the proceeds from the sales were posted to the corporations' accounts, rather than the receipt of actual stock certificates. We conclude that there is ample evidence in the record to support a finding that petitioner and not Jamaica or Dover Downs in fact sold the stock in the earlier period of years in issue, 1970-73. See Anderson v. Commissioner, 92 T.C. 138 (1989). A close examination of the record reveals *753 that neither does the substance of the transactions support the form asserted by petitioner. The actual form of the stock sales made during 1970-73 in fact supports respondent's conduit theory. As this Court stated in Stewart v. Commissioner, supra, although petitioner may minimize his tax liability by any lawful means, the steps he takes to do so must have a valid business purpose apart from the tax-savings motive. The parties agree and the record supports the fact that Jamaica and Dover Downs were in desperate need of cash to fund their operations during the period 1970-73. However, funding operational expenses of a corporation with a contribution of stock was determined not to be a valid business purpose in Abbott v. Commissioner, T.C. Memo. 1964-65, affd. per curiam 342 F.2d 997 (5th Cir. 1965). Nor was use of corporate NOL's to offset gains from sales of appreciated property a sufficient nontax purpose to justify passing title of the property through the corporation in Palmer v. Commissioner, 44 T.C. 92 (1965), affd. per curiam 354 F.2d 974 (1st Cir. 1965), *754 or Abbott v. Commissioner, supra.Moreover, a business purpose of creditor pressure is lacking as petitioner has cited no instance of such pressure on either corporation from any of the banks during the years 1970-73. Smalley v. Commissioner, T.C. Memo. 1973-85. In our view, the corporations' trade creditor accounts payable are within the ambit of operational expenses. In our view, petitioner has simply failed to establish a sufficient nontax business purpose for transmitting the appreciated stock to Jamaica and Dover Downs in the early period, 1970-73. Additionally, the flow of funds from Jamaica and Dover Downs to petitioner during these years raises the specter of whether petitioner benefited directly from the stock sales. Although petitioner urges, and respondent does not disagree, that the stock sale proceeds were used primarily to fund Jamaica's and Dover Downs' operational costs, the cash flows show that Jamaica and Dover Downs used a substantial amount of cash during the early years to repay corporate debts to petitioner and fees to petitioner's consulting firm, Associates. From 1970 through 1973, petitioner *755 loaned Jamaica approximately $ 4,386,000, of which Jamaica repaid $ 4.44 million during those years. Jamaica also repaid a debt of $ 1.1 million dollars to RLC and $ 30,000 of fees to Associates in 1971. Dover Downs made payments of $ 525,000 to Associates and $ 1 million to petitioner during 1970 through 1972. A financially troubled corporation's payment of obligations to those who control its affairs amounts to distributions for their benefit. Hallowell v. Commissioner, 56 T.C. at 609 n.5. The record of the voluminous transactions (purported contributions and stock sales) and other miscellaneous cash flows during the early years in issue does not permit a direct tracing of the stock sale proceeds to Jamaica's and Dover Downs' operational costs, repayment of bank debt, or repayments to petitioner. As in Hallowell v. Commissioner, supra, however, the cash flows back to petitioner in the form of loan repayments are substantial enough to suggest a correspondence between the stock sales and the distributions benefiting petitioner. In the case of Dover Downs, petitioner admits that he was repaid from stock sale proceeds. *756 As we said earlier, in transfers and sales of property between shareholders and closely held corporations, the lines are shadowy and artificial. United States v. Cumberland Pub. Serv. Co., 338 U.S at 456. The record, as we see it, establishes in essence that petitioner attempted to transform his own sales of appreciated stock into sales by his controlled corporations by ordering the brokers to sell the stock and post the proceeds to the corporate accounts. "A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title." Commissioner v. Court Holding Co., 324 U.S. at 334 (fn. ref. omitted). On this record, we hold that in the years 1970-73 petitioner used Jamaica and Dover Downs as conduits through which to pass title to "cash in" his investment in the appreciated stock such that the nonrecognition provisions of section 351 are inapplicable to his transfers. Hallowell v. Commissioner, supra; Stewart v. Commissioner, supra. Therefore, we sustain respondent's allocation of income from the stock *757 sale gains reported by Jamaica and Dover Downs during 1970-73 to petitioner. Said amounts have been agreed to by the parties. Because we have decided that the corporations were used as conduits in the early years, we need not consider respondent's other theories of income reallocation. 2. The Later Years 1975-78: The contributions and sales of stock in issue in the later years, beginning with 1975, were structurally and substantively different than those in the earlier years discussed above. In form, the stock contributions were carried out as separate and distinct transactions from the sales. In substance, petitioner established a direct tracing of the proceeds to the repayment of bona fide corporate debt secured by the stock sold, thus establishing a nontax business purpose outweighing any personal benefit to petitioner. a. Rollins Jamaica and Dover Downs. Mr. Tippie's return to petitioner's staff in 1974 greatly affected the form of the transactions. At Mr. Tippie's direction, petitioner contributed over 9 million dollars' worth of RI, RLC, and Flowers Industries, Inc. stock to Jamaica during 1975-78, and almost $ 1.5 million of RI stock to Dover Downs during 1975. *758 Unlike the transactions in the earlier years, formalisms were observed in the transfers of petitioner's stock to Jamaica and Dover Downs. The contributions of appreciated stock were not concomitant with its sale; rather, title was transferred into the corporate names, and then held by Jamaica and Dover Downs for periods ranging from a few weeks to a few years before it was sold. Pursuant to Mr. Tippie's informal debt workout schedule, petitioner contributed stock to the corporations whose debt it had been securing. The banks agreed to the transfer of the collateral stock's title into the corporations' names because the banks knew they could count on repayment of the corporate debts out of any stock sale proceeds. The stock was registered in Jamaica's and Dover Downs' name and held by them for varying periods of time before the stock was sold. The parties stipulated the dates the shares were contributed to Jamaica between 1975 and 1978, the bank loans they collateralized, and Jamaica's corporate minutes authorizing their sale. Dover Downs' corporate minutes also reflect petitioner's 1975 contribution of RI stock and authorize its sale. Petitioner filed SEC forms reporting the *759 contributions of the stock and listing himself as indirect owner of any stock subsequently sold. The transactions in the later years thus differ in form from those in the early years such that we cannot conclude on the facts that petitioner and not Jamaica and Dover Downs actually sold the stock. See Anderson v. Commissioner, 92 T.C. 138 (1989). The transactions in the later years differ from the early period also because petitioner has established a business purpose for them. Contrary to the situations in Hallowell v. Commissioner, supra, and Stewart v. Commissioner, supra, the parties herein stipulated to summaries tracing the stock sale proceeds to reduction of bona fide corporate debt to various banks during 1975-78. Like the situation in Smalley v. Commissioner, T.C. Memo. 1973-85, there was significant pressure on the corporations from outside creditors to reduce their bank debt, with one bank making a formal threat to liquidate the collateral stock. The corporations desperately needed to strengthen their positions to keep all the banks from calling due the debt. Mr. *760 Tippie's plan was to stave off the banks by consolidating debt and contributing petitioner's stock acting as collateral to the corporations whose debt it had been securing. Given the economic climate and mounting pressures from the banks, petitioner's contributions served as valid a business purpose as the taxpayer's did in Smalley v. Commissioner, supra.
It is true that during 1975-78 there were occasions when the proceeds from sales of stock contributed to Jamaica and Dover Downs were used to pay down petitioner's bank debt as a means of satisfying Jamaica's and Dover Downs' indebtedness to petitioner. We must therefore scrutinize the substance of those transactions to determine whether the corporate business purpose outweighs the personal benefit to petitioner. Dover Downs made payments to petitioner and Associates totaling approximately 10 percent of the $ 1,457,722 proceeds from Dover Downs' 1975 sale of contributed stock. Petitioner had borrowed large sums from FPB during 1974 and 1975 which he in turn loaned to Dover Downs. Under the refinancing plan coordinated by Mr. Weaver, FPB loaned additional money to Dover Downs which was used *761 to retire an amount of petitioner's indebtedness to FPB in excess of Dover Downs' debt to petitioner. Petitioner then assumed other Dover Downs debt to make up the difference. During the period 1975-78, Jamaica repaid $ 12.6 million of its debt to various banks, and close to $ 3 million to petitioner. As in Smalley v. Commissioner, supra, Jamaica and Dover Downs were experiencing direct pressure from banks to pay down their debt. In particular, in 1975 Williams & Glyn's demanded payment of Jamaica and threatened to sell the collateral stock. After petitioner paid off Jamaica's debt to Williams & Glyn's, Mr. Tippie caused Jamaica to assume some of petitioner's personal indebtedness to Shawmut and NBW. The amounts assumed appear in Jamaica's petitioner loan payable account as repayments of its debt to petitioner. Considering the record as a whole, we conclude that the business purpose for the contributions to repay corporate debt is not negated by the fact that sometimes the proceeds were used to repay petitioner or petitioner's indebtedness to the banks. Hallowell v. Commissioner, 56 T.C. 600 (1971), and Stewart v. Commissioner, T.C. Memo. 1982-209, *762 are distinguishable from the facts in the instant cases because the repayments to petitioner or for his benefit had a valid business purpose. In large part, petitioner's controlled corporations' debts to him represented amounts petitioner borrowed from banks unwilling to lend any more money to the corporations directly. Petitioner reloaned the borrowed money to the corporations. Viewing the transactions in the aggregate, it is evident that petitioner did not receive a net benefit from any repayment or debt assumption; the repayments and assumptions occurring after 1974 were part of Mr. Tippie's plan for debt consolidation. That petitioner did not receive money out of these transactions is further confirmed by the parties' stipulation that the stock sale proceeds in the later years went directly to pay the controlled corporations' bank debts. Respondent does not argue that petitioner received any personal benefit from the transactions other than relief from his personal guarantee on the bank debts repaid. We are presented with the factual converse of the situation in United States v. Cumberland Pub. Serv. Co., 338 U.S. 451 (1950), but the principle *763 of the case remains applicable. The conduit analysis does not mean that a controlling shareholder can be taxed on the gain from the sale of property where the corporation has actually sold the property following a genuine contribution of the property. See Anderson v. Commissioner, 92 T.C. at 164-165. We are mindful that the distinction between a shareholder and a corporate sale of transferred property is particularly shadowy in the case of a controlled corporation, but, as we said earlier, it is our duty to decide the factual category into which these transactions belong. United States v. Cumberland Pub. Serv. Co., 338 U.S. at 456. We are satisfied after scrutinizing the record that the transactions were genuine contributions of stock to Jamaica and Dover Downs, followed by sales of the stock by the corporations such that they were not used as conduits for the proceeds. Therefore, as we held in Smalley v. Commissioner, T.C. Memo. 1973-85, we hold here that the contributions served a sufficient nontax business purpose in the years 1975-78 for us to respect them under section 351 and the *764 subsequent sales such that the corporations, and not petitioner, are properly taxable on the proceeds. b. Jefferic Enterprises. After concessions, the only year in issue involving Jefferic is 1977. In that year, Jefferic reported gain from stock sales of $ 320,157. Respondent has failed to present a theory justifying reallocation of the income to petitioner. As with Dover Downs and Jamaica, the record contains a stipulated summary reflecting that $ 294,236.62 (over 90 percent) of the sales proceeds were applied to reduce Jefferic's bank debt. Therefore, for the same reasons applicable to the transactions involving Jamaica and Dover Downs in the later years detailed above, we conclude that Jefferic is properly taxable on the gain it reported from the sale of stock contributed by petitioner in 1977. Respondent has raised other theories under which to impute the income from the stock sale gains reported by Jamaica, Dover Downs, and Jefferic to petitioner, i.e., the doctrines of step-transaction, assignment of income, and clear reflection of income under section 482. The doctrines overlap with each other to a great extent as well as with the substance-over-form conduit analysis *765 discussed above. The step-transaction doctrine views a series of formally separate steps as creating a single transaction, if such steps are in substance integrated, interdependent, and focused toward a particular result. Penrod v. Commissioner, 88 T.C. at 1428. Section 351 does not bar application of the step-transaction doctrine to a transaction. Foster v. Commissioner, 80 T.C. 34, 147 (1983), affd. in part, vacated in part 756 F.2d 1430 (9th Cir. 1985). In order for respondent's theory to prevail in the face of taxpayer compliance with the form of a nonrecognition provision such as section 351, respondent must demonstrate that the structure chosen by the taxpayer was a fiction, a subterfuge, that failed to reflect the economic reality of the transaction. Esmark, Inc. & Affiliated Cos. v. Commissioner, 90 T.C. 171 (1988), affd. without published opinion 886 F.2d 1318 (7th Cir. 1989). When the step transaction doctrine is thus employed to eliminate transitory or unnecessary steps, it overlaps and becomes almost indistinguishable *766 from the business purpose doctrine (under which the unnecessary step is disregarded because lacking in business purpose) and the substance-over-form principle (nullifying the unnecessary step as a formality that merely obscures the substance of the transaction). [Bittker, "Pervasive Judicial Doctrines in the Construction of the Internal Revenue Code", How. L. Jour. 722 (1978); fn. ref. omitted.]
We have already held that in the later years the substance of the transactions reflected the form: petitioner contributed the stock to the corporations which in fact sold the stock, and used the proceeds primarily to pay off bank debt. The contribution step has independent significance because of its nontax business purpose of responding to substantial bank pressure to strengthen the corporations' ability to reduce their debts. Smalley v. Commissioner, supra.Consequently, there is no meaningless step to eliminate. Furthermore, in concluding that the corporations benefited from the stock sale proceeds such that petitioner cannot be considered to have "cashed in" on the stock's appreciation, we have already answered respondent's assignment of income *767 and clear reflection of income arguments. We therefore find no merit in respondent's other theories as applied to the later years. See Stewart v. Commissioner, 714 F.2d at 977; Anderson v. Commissioner, supra.
C. Rollins Brothers Partnership
Although the parties agreed to a two-thirds disallowance of the total amount of Associates' travel and promotional expenses including the Lear jet costs, petitioner reserved the right to argue for an equitable adjustment as to his distributive share (50 percent) of the Lear jet expenses which were included in the partnership's income. Petitioner asks that 50 percent of the disallowed expenses Associates paid to the Partnership for petitioner's Lear jet use in 1967 and 1968 should either be allowed as an expense to Associates or alternatively be eliminated from petitioner's distributive share of partnership income in those years. To support this argument petitioner cites Benjamin v. Hoey, 139 F.2d 945 (2d Cir. 1944), which held that 38 percent of the commissions paid by a taxpayer-partner to his securities brokerage partnership was not *768 taxable income to the partnership. Applying the then accepted analysis that a partnership is an aggregate of its individual partners who are separately taxable (the aggregate approach), rather than the partnership being a separate and distinct entity for tax purposes (the entity approach), the court viewed the taxpayer-partner's transacting business with his partnership as self-dealing to the extent of his 38 percent interest in the partnership. Therefore, the commissions paid by the taxpayer to his partnership were not taxable income to the partnership. We observe that Benjamin v. Hoey, supra, was decided under the Internal Revenue Code of 1939. With enactment of section 707(a) of the Internal Revenue Code of 1954, Congress expressly rejected the aggregate approach to this aspect of partnership taxation and adopted the entity approach to certain specific types of partner-partnership transactions. Pratt v. Commissioner, 550 F.2d 1023, 1026 (5th Cir. 1977), affg. in part and revg. and remanding in part 64 T.C. 203 (1975). Section 707(a) provides if a partner engages in a transaction with *769 a partnership other than in his capacity as a member of that partnership the transaction shall be treated for tax purposes as having occurred between the partnership and one who is not a member of the partnership. The rendering of services by the partnership to the partner is a transaction in which the partner shall be treated as if he were not a member of the partnership. Sec. 1.707-1(a), Income Tax Regs. Therefore Benjamin v. Hoey, supra, is no longer a valid precedent. Heggestad v. Commissioner, 91 T.C. 778, 793 (1988). Under section 707(a) and the entity approach, when Associates leased the Lear jet for petitioner's or Associate's use, for purposes of analyzing the tax consequences of this transaction petitioner is treated as if he were not a partner of the Partnership. A transaction occurred between Associates and the Partnership whereby the former paid money to the latter for use of the Lear jet. Amounts received by the Partnership for leasing its Lear jet constitute taxable income to the Partnership under section 61 regardless of their deductibility to Associates. Petitioner must include in income his *770 distributive share of partnership income for the years in issue, which includes the amounts of rent paid by Associates. In the event that we require petitioner to include in income his distributive share of the partnership's income from Associates' leasing of the Lear jet, petitioner asks for an equitable adjustment in the amount of one half (reflecting his 50 percent share of the partnership's income) of the disallowed two-thirds Lear jet expenses to be allowed as a deduction to Associates. Petitioner does not argue Associates' entitlement to the deduction for other than equitable reasons and is thus asking us to dispense equity. This Court lacks the jurisdiction to grant equitable relief in these circumstances. Estate of Rosenberg v. Commissioner, 73 T.C. 1014, 1017 (1980). In accord with the foregoing, Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Rollins Jamaica, Ltd., docket Nos. 8200-77, 11119-77, 13212-80, and 7971-82; John W. Rollins, docket Nos. 13211-80 and 23449-81; and Jefferic Enterprises, Inc., docket Nos. 13210-80 and 22950-81. The remaining cases are those of John W. Rollins and Linda S. Prickett (Formerly Linda S. Rollins). For the most part, John W. Rollins will hereafter be referred to throughout this opinion as petitioner.↩
2. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
3. Respondent advised the Court at trial that the theory under sec. 269 is being abandoned in each case where raised.↩
4. In an Order and Memorandum Sur Order served on the parties on May 28, 1985, this Court, after a trial of the matter, decided that respondent is estopped from attributing to petitioners over $ 4 million in long-term capital gains resulting from sales of Rollins, Inc. common stock reported by Rollins Jamaica, Ltd. (Jamaica), during 1967, 1968 and 1969, and on which Jamaica had paid over $ 1 million in taxes. In connection with an audit of petitioner's returns filed for those years, respondent had examined and accepted Jamaica's returns as filed and allowed the period of limitations for claiming a refund to expire before issuing the deficiency notices. Applying the principles of consistency, election of remedies, and estoppel established in United States v. Brown, 86 F.2d 798 (6th Cir. 1936), and Vestal v. Commissioner, 152 F.2d 132 (D.C. Cir. 1945), revg. Chilhower Mills, Inc. v. Commissioner, 4 T.C. 558↩ (1945), we held that respondent violated her duty of consistency and fair dealing by asserting an inconsistent position in attributing the stock sale gains to petitioner at a time when Jamaica was precluded from claiming a refund for the taxes it had paid.
5. The parties did not submit a stipulated summary of Jefferic's petitioner loan payable account, nor does the record contain any other information about the loans.↩
6. These amounts differ from those appearing in Jamaica's returns during the years in issue because Rollins Jamaica is on a fiscal year ending September 30, whereas this table uses calendar year totals.↩
1. The trade date for these sales was December 29, 1972, while the settlement date was January 8, 1973. If we determine that such reallocation is necessary, the income from such sales would be properly allocable to petitioners' calendar taxable year 1973.↩
1. Of this amount, $ 242,977.50 represent journal entries "reclassifying" prior debit amounts as interest.↩
2. A journal entry notes that this "balance gives effect to" Jefferic for "cash advance by JWR reclassified as loan repayment by RJL".↩
3. Of this amount, there is a journal entry to explain $ 531,144 as follows: "To offset debit balances in loan payable J.W.R. a/c and accounts receivable J.W.R. a/c vs. Note Payable - J.W.R."  The remark in the margin indicates the "entry reversed and ($ 531,144.17) debited (netted) vs. Accts. Rec. JWR."↩
1. Although the parties labeled this summary "Sales of Rollins International Inc. Common Stock by Dover Downs during calendar Year 1975", the attached sales slips and minutes of Dover Downs' board meeting identify the stock sold as Rollins, Inc.↩
7. The parties submitted conflicting proposed findings of fact as to amounts paid by Dover Downs to petitioner and Associates. They each rely on different stipulated exhibits which are at best only partly legible photocopies of petitioner's and Dover Downs' handwritten cash receipts journals. As the parties stipulated to the amounts appearing in the table, we decline to make any further findings of fact with respect to amounts paid by Dover Downs to petitioner and Associates.↩